Jay B. MALLOTT, Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. 3364.

Supreme Court of Alaska.

Feb. 22, 1980.

Sue Ellen Tatter, Asst. Public Defender, Brian Shortell, Public Defender, Anchorage, for appellant.

Susan M. Delbert, Asst. Dist. Atty., H. L. Davis, Dist. Atty., Fairbanks, Monica Jenicek, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER and MATTHEWS, JJ.

MATTHEWS, Justice.

Jay B. Mallott was convicted by a jury of the rape of a three year old girl. He contends that his right against self-incrimination, and his rights to a fair grand jury proceeding, a fair trial, and an impartial petit jury, have been violated. He also

appeals from the severity of the sentence imposed. While the issues presented have called for careful scrutiny, we affirm.

## I

*Admissibility of Incriminating Statements*

On the morning of May 7, 1976, the Alaska State Troopers were summoned to the home in which the rape occurred. Trooper John McGhee arrived at 5:55 A.M., found Mallott drinking whiskey in the kitchen, and immediately began reading the defendant his *Miranda* rights. He was interrupted by Mallott who put his fingers in his ears and said "he knew what his rights were." A second reading was interrupted by the victim's mother. McGhee finally read the rights through once, asked Mallott whether he understood, and Mallott responded by asking what he was being charged with. McGhee then reread the rights and this time Mallott said he understood them. This is the only time the *Miranda* warnings were given.

Mallott was then taken to the trooper station, where at approximately 8:30 A.M. the following took place, according to Investigator Charles Miller:

> I asked him if he would submit to a breathalyzer examination. I explained to him what a breathalyzer was. In fact I took him to the area where the machine was sitting so that he could see it. Mr. Mallott then said to me that we—meaning the state troopers—would accuse him of having intercourse with the little girl if he took the breathalyzer examination and he *requested an attorney at that time.* I explained to him that in conjunction with the breathalyzer examination he would not be charged with having intercourse with the little girl simply on the basis of that examination, and that if he would not voluntarily submit to a breathalyzer examination, a court order or search warrant could be obtained to get a sample of blood. Mr. Mallott at that time consented to take the breathalyzer exam. [Emphasis added]

Shortly after this exchange, and prior to the administration of the breathalyzer, Mallott made incriminating statements that were. admitted at trial. In response to the prosecutor's question, "And did you have to question him much to get these responses," Miller testified: "No, the answers came fairly easily to him." Miller stated he had asked Mallot only "how he felt and that kind of thing." Mallott's only testimony regarding this entire sequence of events was that he had requested an attorney. After the breathalyzer test was administered, Mallott was taken into a squad room, where he made further incriminating statements to Miller.

■ Mallott first contends that he was informed of his rights while the victim's family was creating a disturbance that made it impossible for the defendant to understand what was being said to him. This argument is groundless; the record clearly shows that Trooper McGhee repeated the *Miranda* warnings until Mallott heard and understood them.

■ Second, Mallott contends that the incriminating statements elicited from him after his request for counsel should have been suppressed. The burden is always on the state to prove that in making an incriminating statement, a suspect voluntarily waived his or her right to remain silent and to have counsel present during questioning. *North Carolina v. Butler,* 441 U.S. 369, 372, 99 .S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979); *Hampton v. State,* 569 P.2d 138, 141 n. 6 (Alaska 1977), *cert. denied,* 434 U.S. 1056, 98 S.Ct. 1225, 55 L.Ed.2d 757 (1978). If a suspect expresses a desire to consult counsel before discussing his or her case with the police, and an incriminating statement is subsequently taken without counsel present, the state's burden in demonstrating a voluntary waiver is a very heavy one. *Ladd v. State,* 568 P.2d 960, 966 (Alaska 1977), *cert. denied,* 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978).[1] The presump-

1. *See also Maglio v. Jago,* 580 F.2d 202, 205 (6th Cir. 1978); *United States v. Hernandez,* 574 F.2d 1362, 1370 (5th Cir. 1978); *Pierce v. Cardwell,* 572 F.2d 1339, 1341 (9th Cir. 1978);

tion is that ignoring or rebuffing a suspect's invocation of his or her constitutional rights will convince the suspect that such rights are illusory. *See Michigan v. Mosley*, 423 U.S. 96, 110 n. 2, 96 S.Ct. 321, 329 n. 2, 46 L.Ed.2d 313, 325 n. 2 (1975) (White, J., concurring); *Miranda v. Arizona*, 384 U.S. 436, 466, 86 S.Ct. 1602, 1623, 16 L.Ed.2d 694, 719 (1966).

In this case however, Mallott's request for counsel did not reasonably imply that he was unwilling to speak about his case without counsel present, the right protected by *Miranda*.[2] In the victim's household Mallot had indicated to Trooper McGhee that he was willing to talk immediately. When he requested an attorney at the trooper station he was not being questioned, but he was being asked to submit to a breathalyzer examination.[3] His request for counsel was simply part and parcel of his refusal to submit to the test. Though

that fact is not dispositive, the appropriateness of Investigator Miller's response to the request for counsel must be judged accordingly.[4]

Mallott made it clear that the basis of his refusal to take the breathalyzer test and his desire for counsel was his fear that the test result would lead to an accusation of rape. Miller accurately informed him that the test result would not form the basis of any such accusation. He also informed Mallott that the troopers could obtain the same evidence by court order. On the basis of this information, Mallott consented to the examination. It was reasonable for the trooper to believe, after the foregoing sequence of events, that Mallott no longer desired counsel.

The sequence that followed supports the conclusion that Mallott never intended to indicate an unwillingness to discuss his case in the absence of counsel. As the breatha-

---

*White v. Finkbeiner*, 570 F.2d 194, 200 n. 3 (7th Cir. 1978); *Government of Canal Zone v. Gomez*, 566 F.2d 1289, 1291–92 (5th Cir. 1978).

**2.** Though the point is often obscured, *Miranda* did not establish a general right to counsel during detention, but only a right to counsel for the purpose of protecting against involuntary self-incrimination: "[T]he right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today." 384 U.S. at 469, 86 S.Ct. at 1625, 16 L.Ed.2d at 721. *See also Fare v. Michael C.*, 442 U.S. 707, 716, 99 S.Ct. 2560, 2567–68, 61 L.Ed.2d 197, 207–08 (1979); *Brewer v. Williams*, 430 U.S. 387, 397, 97 S.Ct. 1232, 1238, 51 L.Ed.2d 424, 435 (1977); *Loveless v. State*, 592 P.2d 1206, 1209–10 (Alaska 1979).

**3.** Mallott does not claim that he had a right to have an attorney present during the breathalyzer examination, but only that no interrogation should have occurred after his request for counsel. The state affirmatively maintains that Mallott had no right to counsel with respect to the breathalyzer, since the latter could not have produced "testimonial evidence," *see Loveless v. State*, 592 P.2d 1206, 1209 (Alaska 1979). Nor was it a "prejudicial procedure," *see Blue v. State*, 558 P.2d 636, 641 (Alaska 1977). The issue is of some importance with respect to evaluating the propriety of the trooper response to Mallott's request for counsel. For purposes of this case we accept the state's arguments inasmuch as it is difficult to imagine how the breathalyzer result could have incriminated or prejudiced Mallott in a trial for rape.

**4.** Since *Miranda* provides a right to counsel for the purpose of protecting the privilege against self-incrimination, *supra* note 2, a request for counsel that is made for an unrelated purpose should not trigger the procedures mandated by *Miranda*. *See, e. g., United States v. Wyatt*, 561 F.2d 1388, 1390 (4th Cir. 1977) (attorney requested with reference to bail, not questioning). *See also Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) where the Court stated with respect to the more firmly rooted post-indictment right to counsel: "no such constitutional protection would . . . come into play if there [were] . . . no interrogation." 430 U.S. at 400, 97 S.Ct. at 1240, 51 L.Ed.2d at 437. However it is extremely difficult to say, even here, that an express request for counsel is not somehow connected to protecting the privilege against self-incrimination, and courts have generally applied *Miranda* to any request for counsel made during pre-indictment detention. *See, e. g., Commonwealth v. White*, —— Mass. ——, ——, 371 N.E.2d 777, 780 (Mass.1977), *aff'd. mem.*, 439 U.S. 280, 99 S.Ct. 712, 58 L.Ed.2d 519 (1978); *People v. Buxton*, 44 N.Y.2d 33, 35, 403 N.Y.S.2d 487, 488, 374 N.E.2d 384, 386 (N.Y. 1978). *See also Dimmick v. State*, 473 P.2d 616, 619 (Alaska 1970). Nonetheless the context in which a request is made is relevant in determining whether the police response was proper or whether the response precluded a subsequent voluntary statement by the suspect.

lyzer equipment was being readied, Miller and Mallott stood talking in a hallway of the trooper station. For the first time, Miller asked Mallott questions about what had happened. This was ten to fifteen minutes after the request for counsel. The questions were general, not accusatorial. Mallott spoke freely, apparently believing the story he was telling to be exculpatory. Had Mallott initially desired counsel to protect his right to remain silent, we do not believe the initial trooper response and the interrogation just described would have convinced him that a second attempted exercise of his rights would have been futile. We therefore find the trooper response to Mallott's request for counsel proper, and also concur in the trial court's determination that Mallott voluntarily waived his right to have counsel present prior to speaking with the police. *Hampton v. State*, 569 P.2d 138, 141 n. 6 (Alaska 1977), *cert. denied*, 434 U.S. 1056, 98 S.Ct. 1225, 55 L.Ed.2d 757 (1978).

 Mallott's third contention is that the incriminating statements he later made to Miller in the squad room were coerced in that they followed an angry and humiliating outburst against him by another trooper. Since the record shows that the outburst *followed* the squad room interrogation, we find no merit in this argument.[5]

 Finally, Mallott claims that he was too inebriated to voluntarily make incriminating statements. *See Thessen v. State*, 454 P.2d 341, 345–6 (Alaska 1969), *cert. denied*, 396 U.S. 1029, 90 S.Ct. 588, 24 L.Ed.2d 525 (1970). Just after his first statements were made, Mallott's breatha-

lyzer test resulted in a .31 reading, indicating an alcohol level that, according to testimony at trial, would render 90% of the population unable to function. It is quite clear however, that Mallott was able to function rationally. Trooper McGhee had "no problem getting" information from Mallott regarding height, weight, birthdate, hair and eye color, address, and social security number. Investigator Miller testified: "I felt his responses to my questions were adequate, that he knew what he was saying, that he knew where he was, who was questioning him, why he was there." Mallott himself testified that he'd been only "half drunk, half sober." This assessment was corroborated by other witnesses. We conclude that Mallott had sufficient control of his faculties to voluntarily make the statements admitted against him. *See Hampton v. State*, 569 P.2d at 143.

## II

### *Failure to Present Exculpatory Evidence to Grand Jury*

 Mallot contends that his .31 breathalyzer reading tended to prove his physical incapacity to have an erection and thus commit rape. He argues that the grand jury indictment should now be dismissed because the grand jury was not informed of the test result. This omission is alleged to have violated due process[6] and Alaska Rule of Criminal Procedure 6(q).[7]

We have recently held that Criminal Rule 6(q) imposes an affirmative duty on a prosecutor to present to the grand jury "evi-

---

5. At trial, Mallott did not testify that the outburst preceded his statements. His claim on appeal is solely the result of a misreading of the trooper's trial testimony. It is appropriate at this time however, to advise law enforcement agencies that as part of their duty to preserve evidence, *see Catlett v. State*, 585 P.2d 553, 558 n. 5 (Alaska 1978), it is incumbent upon them to tape record, where feasible, any questioning and particularly that which occurs in a place of detention. *See* Uniform Rules of Criminal Procedure, Rule 243 (10 U.L.A. 57) (1974).

6. Alaska Const. art. I, § 7, and U.S.Const. Amend. V guarantee in pertinent part that:

No person shall be deprived of life, liberty, or property, without due process of law.

7. Rule 6(q) reads in pertinent part:

When the grand jury has reason to believe that other available evidence will explain away the charge, it shall order such evidence to be produced and for that purpose may require the prosecuting attorney to subpoena witnesses. . . . The grand jury shall find an indictment when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant.

dence tending to refute, as well as establish, guilt." *Frink v. State*, 597 P.2d 154, 165 (Alaska 1979). We are not persuaded however that the breathalyzer test result reasonably tended to negate Mallott's guilt.

First, Mallott drank an unknown quantity of whiskey between commission of the rape and the administration of the breathalyzer test. Thus the .31 reading was not probative of Mallott's state of intoxication at the time the rape occurred. Second, the .31 result could not have been presented to the grand jury in isolation without creating a misimpression in Mallott's favor. To present the evidence in a meaningful context, the prosecutor would have had to show that while a .31 alcohol level would leave most men in a stupor, Mallott himself was functioning rationally at that level. In context, the .31 reading would not reasonably have tended to prove Mallott's physical incapacity to commit rape. Our perusal of the grand jury transcript convinces us that the evidence given the grand jury regarding Mallott's state of intoxication was accurate.

We conclude that the prosecutor did not breach the duty imposed by Criminal Rule 6(q). Since we have held Rule 6(q) to impose at least as great a duty on a prosecutor as does our state constitution, *Frink*, 597 P.2d at 166 n. 23, and since no comparable duty exists under federal law in this circuit, *United States v. Y. Hata and Co., Ltd.*, 535 F.2d 508, 512 (9th Cir.), *cert. denied*, 429 U.S. 828, 97 S.Ct. 87, 50 L.Ed.2d 92 (1976), we affirm the trial court's denial of Mallott's motion to dismiss the indictment.

## III

### *Pre-Trial Publicity*

Mallott next argues that the trial court failed to protect him from adverse pre-trial publicity by denying his motions to bar the press from pre-trial proceedings, transfer venue, and dismiss four jurors for cause. He contends that his right to a fair trial

and impartial jury were therefore compromised.[8] We find no merit in these claims.

### A. *Closure of Pre-Trial Proceedings.*

On three different occasions, Mallott raised the issue of excluding the press from suppression proceedings. On the first occasion, July 19, defense counsel informed the court that such a procedure was of dubious constitutionality, and appeared to be satisfied when the court asked the press to exercise restraint. On the second occasion, July 23, defense counsel persuaded the court to consider the procedure, but a ruling was withheld because no member of the press was present. The hearing then continued without further interruption. It is therefore only the third motion, made on September 16, that concerns us. On that date, argument concerning the suppression of Mallott's incriminating statements as well as certain items of physical evidence, was to be heard. The gist of the incriminating statements had been available for public inspection in the superior court file, which the defendant had never sought to seal, since July 19, and the physical evidence had previously been referred to in an *Anchorage Times* article on July 29. Mallott's motion was denied.

No authority has been cited to us for the proposition that a court's decision to keep pre-trial proceedings open to the press and public can constitute reversible error. The only controversy in this area has concerned the constitutionality of *excluding* the public from a judicial proceeding. In *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), the Supreme Court recently resolved the latter issue as a matter of federal law, holding that where a criminal defendant, the prosecutor, and the trial judge agree to close a suppression hearing, the rights of the press and public are not thereby violated. *Id.* 99 S.Ct. at 2911, 2912, 61 L.Ed.2d at 629, 630. The Court hastened to add, however, that a defendant has no "right to

---

8. U.S.Const. Amend. VI and Alaska Const. art. I, § 11 provide in part: "In all criminal prosecutions, the accused shall have the right to a

speedy and public trial, by an impartial jury . . . ."

compel a private trial,"[9] and recognizing the significant societal interests involved in open judicial proceedings, *id.* 99 S.Ct. at 2907, 61 L.Ed.2d at 623,[10] indicated that a court's refusal to close a proceeding would never be grounds for reversal. *Id.* 99 S.Ct. at 2905 n. 6, 61 L.Ed.2d at 621 n. 6.[11] There is thus *no basis for Mallott's prayer for relief* under federal law, and we decline at this time to adopt a rule under our state constitution that would *require* exclusion of the public from particular proceedings.[12]

## B. Transfer of Venue

Mallott initially moved for a change of venue on July 15, 1976. He advised the court at that time, however, that he wished to have a ruling deferred until some two weeks prior to trial because he hoped to obtain a fair trial in Anchorage. Subsequently Mallott was granted a continuance and trial was rescheduled for October 21. The motion was finally heard on the merits and denied on October 4, at which time the court indicated its belief that voir dire would be a far superior barometer of prejudice. At the conclusion of an exhaustive voir dire Mallott did not renew his motion, presumably because it was clear to all concerned that an impartial jury had been selected.

While the pre-trial publicity in this case involved eleven newspaper articles, two editorials, various letters to the editor, and several radio and television reports, the actual crime and the substance of pre-trial proceedings received relatively little attention most of which came two to three months prior to the October 4th ruling. While the *Anchorage Times* inaccurately reported the presence of eyewitnesses three times, published a short paraphrase of one of Mallott's incriminating statements, and disclosed somewhat misleadingly the existence of certain pieces of evidence, these and other substantive items were the subject of only five articles,[13] all but one of which were published nearly three months prior to voir dire.[14] The *Anchorage Daily News* reported the facts on one occasion only, referring therein to Mallott's relatively insignificant criminal record. The record reflects television and radio coverage of this case occurring only on September 17, at which time brief news reports mentioned Mallott's name and referred in a single sentence to the alleged rape, while focusing primarily on Judge Moody's reprimand of counsel for "dragging their feet." The remainder of the articles mentioning this case were devoted almost exclusively to the broader issues raised by Mallott's release on bail, but even this heated controversy subsided by mid-August, some two months prior to voir dire.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755 (1961). The ultimate objective of the trial court therefore is to find twelve jurors "who would,

---

**9.** This was the only point upon which all justices agreed. *Gannett*, 99 S.Ct. at 2907, 61 L.Ed.2d at 623, 632.

**10.** *See generally,* Note, *Trial Secrecy and the First Amendment Right of Public Access to Judicial Proceedings,* 91 Harv.L.Rev. 1899 (1978).

**11.** Though a few courts had permitted closure of proceedings prior to the *Gannett* decision, *see Gannett Pacific Corp. v. Richardson,* 580 P.2d 49 (Hawaii 1978); *Philadelphia Newsp., Inc. v. Jerome,* 478 Pa. 484, 387 A.2d 425, *vacated,* 434 U.S. 241, 98 S.Ct. 546, 54 L.Ed.2d 506 (1978); *Williams v. Stafford,* 589 P.2d 322 (Wyo.1979), there are no reported cases holding that a judge erred in *failing* to close a pre-trial hearing.

**12.** Indeed, given that the permissibility of excluding the public and press is not an issue directly raised by this appeal, and that the public's interest in open proceedings has therefore not been adequately advocated we do not find this to be an appropriate time to decide whether the Alaska Constitution mandates or is controlled by the actual holding reached in *Gannett.*

**13.** We further note that of these references, only the report of eyewitnesses appeared in a front page article.

**14.** The last substantive article appeared on September 17.

under the proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." *Nebraska Press Association v. Stuart*, 427 U.S. 539, 569, 96 S.Ct. 2791, 2807, 49 L.Ed.2d 683, 703 (1976). Whether pretrial publicity is so prejudicial and so pervasive that no such jury could be selected to try a particular case in a particular locale is a determination that is exceedingly difficult to make prior to the questioning of potential jurors. Therefore almost without exception trial courts have been permitted the discretion to rely on voir dire rather than their own speculation as to the impact of pretrial publicity.[15] Indeed, there appears to be but a single case in which an appellate court, either state or federal, has deemed publicity so inconsistent with due process that prejudice was presumed, and a conviction reversed, without reference to juror attitudes revealed on voir dire.

 In that case, *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the defendant's filmed twenty-minute confession to bank robbery, kidnapping, and murder, was televised three times in a community of one hundred fifty thousand persons. There the Court stated:

For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

. . .

*Id.* at 726, 83 S.Ct. at 1419, 10 L.Ed.2d at 665. In *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), in which denial of the defendant's motion to shift venue was upheld, the Court limited the *Rideau* holding to the exceptional circumstances present in that case, and looked to the actual impact of the pre-trial publicity as revealed by the voir dire. *Id.* at 798–803, 95 S.Ct. at 2035–2037, 44 L.Ed.2d at 594–96.[16]

 The fact that a trial court is entitled to proceed with voir dire is, of course, not to say that a trial court should fail to exercise the discretion conferred on it by AS 22.10.040(1) to change venue "when there is reason to believe that an impartial trial cannot be had."[17] Voir dire

15. *See, e. g., Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *United States v. Johnson*, 584 F.2d 148, 154 (6th Cir. 1978); *United States v. Haldeman*, 181 U.S. App.D.C. 254, 284, 559 F.2d 31, 61 (D.C.Cir. 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Crow Dog*, 532 F.2d 1182, 1188 (8th Cir. 1976), *cert. denied*, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977); *Bishop v. Wainwright*, 511 F.2d 664, 666 (5th Cir. 1975), *cert. denied*, 425 U.S. 980, 96 S.Ct. 806, 48 L.Ed.2d 806 (1976); *United States v. Mandel*, 415 F.Supp. 1033, 1073 (D.Md.1976); *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287, 295 (1978). *But see Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *United States v. Abrahams*, 453 F.Supp. 749, 751–2 (D.Mass. 1978).

16. Reliance on voir dire in all but exceptional circumstances is premised on several overlapping considerations. First, even when public opinion surveys can adequately assess the probability of prejudice in a community, voir dire investigates the more significant impact of publicity, namely, its impact on the specific persons called to form a jury. *See* R. Simon, *Does the Court's Decision In Nebraska Press Association Fit the Research Evidence on the Impact on Jurors of News Coverage?* 29 Stan. L.Rev. 515, 518–23, 526–28 (1977). Second, impaneling on impartial jury is rarely as impossible as pre-trial argument makes it out to be. *See, e. g., United States v. Haldeman*, 181 U.S. App.D.C. 254, 285 n. 37, 559 F.2d 31, 62 n. 37 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Third, as we recognized in *Alvarado v. State*, 486 P.2d 891, 902 (Alaska 1971), conducting a trial in the community in which the crime was committed is itself part of the jury trial right.

17. In its 1968 version, standard 8–3.2(d) of the ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press, proposed that a trial court *should* transfer venue prior to voir dire as long as it was reasonably likely that a fair trial could not be had. In its 1978 tentative revision, standard 8–3.3(d) permits deferring the ruling until after voir dire. In the subsequent commentary however, *id.* at 18, it is recommended that the option of an earlier transfer of venue not be ignored simply on the basis of convenience.

cannot necessarily be relied upon to compel jurors to admit either their exposure or their prejudice, particularly when the jurors themselves are unaware of such prejudice.[18] In addition, courts must always be sensitive to the impropriety of conducting a trial in an atmosphere hostile to a defendant, regardless of a defendant's inability to show actual prejudice. In such cases it is important that the trial court give serious consideration to a pre-voir dire motion to transfer venue.[19] However, in the absence of "inherently prejudicial pre-trial publicity"[20] so inflammatory that a subsequent trial in that locale would be, or would appear to be, but "a hollow formality," we will not find reversible error merely because the trial judge chose to proceed with voir dire to determine the impact of the publicity.[21]

■ In the instant case, the pre-trial publicity in July, 1976, approached an inflammatory level.[22] At that time, however, Mallott's attorney indicated that a fair trial might yet be possible in Anchorage, and if such were the case, venue in Anchorage would be desirable. A ruling on the motion was therefore deferred, and, as a result of a continuance granted by the trial court, was not made until October 4. By that time[23] media coverage of this case was minimal and not inflammatory, and, with only one exception,[24] the few articles that appeared in August and September were concerned with bail procedures generally rather than with the facts of this case.[25] We therefore find that the trial court neither abused its discretion nor violated Mallott's right to an impartial jury in choosing to proceed with voir dire to determine the impact of the July publicity.

■ The voir dire conducted in this case was exceptionally thorough. Thirty-six jurors were examined individually over a period of four days, producing testimony filling more than seven hundred pages of tran-

18. See D. Broeder, *Voir Dire: An Empirical Study*, 38 So.Cal.L.Rev. 503, 528 (1965); R. Isaacson, *Fair Trial and Free Press: An Opportunity for Co-existence*, 29 Stan.L.Rev. 561, 563 (1977); 1978 A.B.A. Standards, *supra* note 17 at 18; 1968 A.B.A. Standards, *supra* note 17 at 127.

19. In those cases in which the Supreme Court has reversed convictions on the basis of publicity both before and during trial, the general atmosphere of hostility to the defendant, rather than actual prejudice, was the decisive factor. *See Sheppard v. Maxwell*, 384 U.S. 333, 352, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600, 614 (1966); *Estes v. Texas*, 381 U.S. 532, 542, 85 S.Ct. 1628, 1632, 14 L.Ed.2d 543, 550 (1965). *See also Henley v. State*, 576 S.W.2d 66, 72 (Tex.Cr. App.1978) (trial court must hear pre-voir dire motion to transfer venue).

20. *See United States v. Jones*, 542 F.2d 186, 193 (4th Cir.), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). "A confession of statement against interest is the paradigm" of inherently prejudicial publicity. *Nebraska Press Ass'n v. Stuart*, 423 U.S. 1327, 1333, 96 S.Ct. 251, 255, 46 L.Ed.2d 237, 242 (1975) (Blackmun, Circuit Justice).

21. We stated in *Brown v. State*, 601 P.2d 221, 230 (Alaska 1979), "[p]rior to voir dire, the change of venue motion need not be granted unless the pretrial publicity is so prejudicial that it appears highly unlikely that an impartial jury can be selected."

22. On July 3, for example, the *Anchorage Times* ran a first page headline that read: "Alleged Rapist Can Go Fishing." Nearly all other items designed to arouse readers' emotions were in the form of editorials and letters to the editor.

23. When publicity is generated by a particular event in the pre-trial stages of a prosecution, such as the bail issue in this case, a continuance may effectively dissipate the impact of that publicity, and is an alternative recommended in A.B.A. Standard 8–3.3(c) (1978). *See* 1968 A.B.A. Standards, *supra* note 17 at 120.

24. That article, published in the *Times* on September 17, contained references to Investigator Miller's testimony at the suppression hearing, and included several quotations highly prejudicial to Mallott, though these were not prominently displayed. Though prejudicial, a single article could not by itself create a presumption that an entire community was roused to hostility against a defendant.

25. Though such articles intermittently dangled Mallott's name before the public eye, they did not focus on the crime, making only passing reference to the general allegation that a young child was involved.

script.[26] Counsel, with encouragement from the court, probed extensively for juror exposure to and prejudice from the pre-trial publicity.

The ultimate burden imposed on a defendant by the Supreme Court with respect to transfer of venue has been to demonstrate that pre-trial publicity actually resulted in "a partiality that could not be laid aside" in those jurors finally seated to adjudicate guilt or innocence. *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 595 (1975). Under such a standard Mallott's claim would most certainly fail, since he cannot and does not maintain that the voir dire examinations of his jury panel revealed even a shred of evidence that any of the impaneled jurors were predisposed to convict him.

As we have noted above however, the voir dire process is not an infallible Geiger counter of juror prejudice, and to rely excessively on its efficacy in uncovering "actual prejudice" places an unrealistic burden on a defendant. Where there has been intensive pre-trial publicity, and a substantial number of venirepersons appear to have been prejudiced by the publicity, the probability that similar prejudices are shared by, but have not been extracted from, impaneled jurors cannot be ignored. We therefore adopt the A.B.A. proposal that

> A motion for change of venue or continuance shall be granted whenever it is determined that, because of the dissemination of potentially prejudicial material, there is a substantial likelihood that, in the absence of such relief, a fair trial by an impartial jury cannot be had. . .
> A showing of actual prejudice shall not be required.

1978 A.B.A. Standard 8–3.3(c), *supra* note 17.

Once voir dire examinations had commenced, Mallott never again raised the issue of venue, and therefore the trial court did not explicitly make the foregoing evaluation. We need not rely on the apparently deliberate waiver, however, since based on our own review of the record, we are convinced that there was little likelihood of hidden prejudice in the impaneled jury.

Of the thirty-six persons examined, more than one-fourth had heard or read nothing about the alleged crime and another third had heard no more than the bare allegation, which in any event was read to the venire prior to voir dire. Of the remaining thirteen venirepersons, only six can even arguably be said to have been exposed in any depth to the pre-trial publicity, and only one potential juror had any inkling that Mallott had made incriminating statements.[27] Of the persons selected to serve on the jury, including the alternate juror, only two had even heard of the bail controversy. Finally, five or six venirepersons confessed to varying degrees of emotional reaction upon learning of the crime, but the voir dire examinations indicated that, for most of these persons, the same response might as easily have occurred upon learning of the nature of crime from the trial judge rather than the media. Given the minimal degree to which the venire was exposed to pre-trial publicity, the non-incriminating nature of the information to which the vast majority were exposed, and the lack of prejudicial attitudes revealed by the venire generally,[28] we find the likelihood that Mallott's panel harbored unrevealed prejudices as a result of the publicity to be very slight. The trial court's decision to retain venue in Anchorage is therefore affirmed.

### C. Challenges for Cause

During the voir dire Mallott challenged four potential jurors for cause under Crimi-

---

**26.** Individual voir dire is highly recommended when the impact of pre-trial publicity is an issue. *See, e. g., United States v. Dellinger*, 472 F.2d 340, 366–67 (7th Cir. 1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); B. Babcock, *Voir Dire: Preserving "It's Wonderful Power,"* 27 Stan.L.Rev. 545, 547 (1975); J. Ranney, *Remedies for Prejudicial Publicity*, 21 Vill.L.Rev. 819, 834 (1975–76);

A.B.A. Standard 8–3.5(a) (1978), *supra* note 17; 1968 A.B.A. Standards, *supra* note 17 at 135.

**27.** This juror was struck for cause.

**28.** *See* 1978 A.B.A. Standard 8–3.5(b), *supra* note 17; 1968 A.B.A. Standards, *supra* note 17 at 137.

nal Rule 24(c)(3),[29] on the basis of emotional biases revealed by the examinations. The trial court dismissed each of the four. In addition, Mallott challenged three jurors for cause on the basis of their exposure to a fair amount of publicity, and one juror on both grounds. Since these four jurors persuaded the court of their ability to be impartial, the challenges were denied and Mallott was forced to exercise a peremptory challenge with respect to each.

■ As discussed *supra*, the extent of a venire's exposure to prejudicial publicity is a significant factor in determining the question of venue insofar as the general degree of exposure arouses suspicion of hidden prejudices. It follows that the trial judge should exercise an equal degree of caution to prevent individuals who have been exposed to a substantial amount of prejudicial publicity from serving on the actual jury.

■ Judge Kalamarides did precisely that in this case. While correctly noting that Rule 24(c)(3) does not contemplate a challenge for cause on the basis of mere exposure to prejudicial information, he offered Mallott as many additional peremptory challenges as would enable the selection of an impartial jury.[30] Mallott chose to accept only one additional challenge, underscoring our assessment that the jury that tried this case was an impartial one. Since none of the persons whom Mallott unsuccessfully challenged for cause actually served on the jury, the impartial jury guarantee was fully protected here.

■ Since the danger of impaneling a biased juror directly implicates a constitutional right we are not content with simply encouraging trial judges to increase the number of peremptory challenges in a case involving pretrial publicity. Nor can Rule 24(c)(3) be read to adequately protect that right. While the objective of the impartial jury guarantee is not to eliminate literate or thoughtful jurors,[31] neither is it sufficient to accept at face value a person's assurance that he or she has not prejudged the facts of the case, despite substantial exposure to the facts as reported by the media. To better protect a defendant's right as guaranteed by the state constitution, we adopt the following recommendation of the American Bar Association:

(b) Standard of acceptability

Both the degree of exposure and the prospective juror's testimony as to state of mind are relevant to the determination of acceptability. A prospective juror testifying to an inability to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective juror remembers information that will be developed in the course of the trial, or that may be inadmissible but does not create a substantial risk of impairing judgment, that person's acceptability shall turn on the credibility of testimony as to impartiality. If the formation of an opinion is admitted, the prospective juror shall be subject to challenge for cause unless the examination shows unequivocally the capacity to be impartial. A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to the prospective juror's testimony as to state of mind.

Whenever there is a substantial likelihood that, due to substantial publicity, the regularly allotted number of peremptory challenges is inadequate, the court shall permit additional challenges to the extent necessary for the impaneling of an impartial jury.

**29.** Criminal Rule 24(c)(3) states the following as a ground for a challenge for cause:

That the person shows a state of mind which will prevent him from rendering a just verdict, or has formed a positive opinion on the facts of the case or as to what the outcome should be, and cannot disregard such opinion and try the issue impartially.

**30.** 1978 A.B.A. Standard 8-3.5(c), *supra* note 17, provides:

**31.** *See Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 595 (1975), *quoting Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 756 (1961).

Standard 8–3.5(b), ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press (1978). Since Judge Kalamarides saw to it that Mallott's rights were protected by offering him additional peremptory challenges, we have no reason to examine whether the four jurors who were unsuccessfully challenged under Rule 24(c)(3) should have been dismissed under the rule as adopted.

## IV

### Use of Peremptory Challenges to Exclude Native Jurors

 Mallott and his victim are Alaska Natives. Two Alaska Natives were on the venire for the trial of this case. Both of them were challenged peremptorily by the prosecution.[32] Mallott claims that their exclusion denied him his right to an impartial jury and to equal protection of the law.

 In *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the United States Supreme Court held that where there is no showing of a systematic pattern, over time, of exclusion of a particular racial group from sitting on juries, a prosecutor's motives may not be inquired into when he excludes members of that group from sitting on a particular case by the use of peremptory challenges. The majority opinion by Justice White, expressing the view of five members of the Court, and the dissenting opinion of Justice Goldberg, joined by Chief Justice Warren and Justice Douglas, were in agreement on this point.

In the present case Mallott has acknowledged that there exists no record of systematic exclusion of Alaska Natives from petit juries. He argues that such a showing is unnecessary where a defendant can show by other means that a prosecutor in a particular case has exercised peremptory challenges based on the race or other group affiliation of a prospective juror. Under *Swain*, however, it is quite clear that in a particular case a prosecutor may exercise a peremptory challenge based on the race of the veniremember:[33]

> [The peremptory challenge] is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. For the question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be. It is well known that these factors are widely explored during the voir dire, by both prosecutor and accused (citations omitted). This court has held that the fairness of trial by jury requires no less. (Citation omitted). Hence veniremen are not always judged solely as individuals for the purpose of exercising peremptory challenges. Rather they are challenged in light of the limited knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried.

> With these considerations in mind, we cannot hold that the striking of Negroes in a particular case is denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. [Footnotes omitted].

*Id.* at 220, 221, 85 S.Ct. at 836, 13 L.Ed.2d at 772, 773. Thus it is established that under prevailing federal constitutional doctrine Mallott's claim is without merit.

In a supplemental brief, ordered by this court, Mallott has urged that we adopt the holding of the California Supreme Court in the case of *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978) and apply it here. In *Wheeler* the exercise of peremptory challenges in a criminal case based solely on group affiliation was held to violate the state constitutional right to trial

---

**32.** Alaska R.Crim.P. 24(d) allows the prosecutor six peremptory challenges in a felony case. The defendant is allowed ten.

**33.** *See United States v. Danzey*, 476 F.Supp. 1065 (E.D.N.Y.1979) in which this aspect of *Swain* was recently confirmed.

by a jury drawn from a representative cross-section of the community. *Wheeler* has been followed in Massachusetts, *Commonwealth v. Soares*, —— Mass. ——, 387 N.E.2d 499 (1979). The rationale of *Wheeler*, reliance on the representative cross section rule, has been criticized as being itself based on group stereotypes:

> [T]he theory applied by [the Massachusetts and California] courts in condemning the use of peremptory challenges to exclude jurors on the basis of group affiliation alone—the fair cross section requirement applied to petit juries—is based on the notion that every juror has a group identification and corresponding prejudice that can only be cancelled by interaction with other jurors in any given trial. This notion could perhaps be justified if venires were drawn from lists on which only a few community groups with voluntary memberships and well-established viewpoints were represented—for example the Ku Klux Klan and the Black Panther Party. But it is at best simplistic to assume that every petit juror has a group bias based on immutable characteristics such as race or sex that is strong enough to affect her vote but weak enough to be swayed by deliberating with the other jurors. [Footnotes omitted].

Note, *The Defendant's Right to Object to Prosecutorial Misuse of the Peremptory Challenge*, 92 Harv.L.Rev. 1770, 1781–82 (1979).[34]

Under the *Wheeler* rule a presumption exists that peremptory challenges are exercised properly. The presumption may be overcome by a showing that persons of a cognizable group within the meaning of the representative cross-section rule have been excluded by peremptory challenges and that there is a "strong likelihood that such persons are being challenged because of their group association rather than because of

any specific bias." 148 Cal.Rptr. at 905, 583 P.2d at 764. Likewise under the Massachusetts formulation of this rule a pattern of exclusions must be demonstrated which is shown to have been probably motivated solely by the excluded veniremember's group membership. In both cases, when the presumption is overcome the party who has exercised the questioned peremptory challenges must justify them by showing that they are based on considerations other than group membership.

■ We do not believe that this is an appropriate case in which to decide whether the *Wheeler* rule should be adopted in Alaska. Here there were only two Alaska Natives called to the jury box. One was excused peremptorily only after a challenge for cause based on her acquaintance with the defendant and his relatives was denied. The other had been accused by the state of a misdemeanor violation of this state's fish and game laws. We have recently held that Alaska Rule of Criminal Procedure 24(c)(11) permits the state to challenge for cause any juror who has been accused by the state in a criminal prosecution. *Lupro v. State*, 603 P.2d 468, 480 (Alaska 1979). At least until such time as the rule is amended, *see id.* at 480, we must accept an individual's adverse contact with a law enforcement agency as a reasonable ground for the prediction that the juror will be hostile to the state's interest in prosecution.

Thus, the record of the voir dire fails to indicate a strong likelihood that the challenges in question were motivated by group association rather than by specific bias. Under these circumstances the presumption that peremptory challenges are exercised properly would not have been overcome. There would have been no occasion to require the state to justify the use of its

---

**34.** While the authors of the Note are critical of the rationale of *Wheeler* and *Soares*, they conclude that the result is correct because "[t]o allow the prosecutor, with the state's implicit endorsement, to exercise peremptory challenges on the basis of group affiliation violates the principle that such affiliation alone does not determine an individual's ability to be an

impartial juror [and] casts a shadow on the appearance of integrity which must of necessity underlie public identification with the verdict." [Footnote omitted] Note, *The Defendant's Right to Object to Prosecutorial Misuse of the Peremptory Challenge*, 92 Harv.L.Rev. 1770, 1781–82.

peremptory challenges in this case even if the *Wheeler* rule were in effect. We shall, therefore, defer our decision on the important question of whether *Wheeler* should be followed in Alaska until we have a case in which the question is squarely presented.

## V

### *Sentence Appeal*

■ Mallott appeals his sentence of thirty years, with fifteen years suspended, on the ground that it is excessive. We will vacate a sentence on that ground only when it is clearly mistaken. *McClain v. State*, 519 P.2d 811, 813 (Alaska 1974).

AS 11.15.130(a) provides that the rape of a person under sixteen years, by a person nineteen years or older, is punishable by imprisonment for any terms of years.

> [F]orcible rape ranks among the most serious crimes. The reason such a crime is most serious is because it amounts to a desecration of the victim's person which is a vital part of her sanctity and dignity as a human being. Although the perpetrator of such a crime may not be beyond rehabilitation, which the judge recognized in this case, the crime itself deserves community condemnation; in addition to serving rehabilitative purposes the sentence must reflect such condemnation as well as act as a deterrent to the offender and to others.

*Newsom v. State*, 533 P.2d 904, 911 (Alaska 1975). *See also Bordewick v. State*, 569 P.2d 184, 186 (Alaska 1977).

In sentencing, the trial court stated that "the offense itself . . . is of such heinous proportions, that community condemnation does play a major role in . . this particular sentence." We explained in *Smothers v. State*, 579 P.2d 1062 (Alaska 1978), that a

> judge's balancing of the factors of rehabilitation, isolation, and deterrence must also include an awareness that in sentencing, he is reflecting community beliefs

that certain norms are viable and will be upheld by the Courts.

*Id.* at 1064. We added:

> Even though in an individual case, rehabilitation of the wrongdoer would require no punishment other than his personal remorse and nothing would be required to deter him or others from like conduct, preserving societal norms may necessitate an appropriate sentence.

*Id.* at 1064 n. 7.

The trial court was well aware that the defendant at the time of sentencing was forty-six years old, articulate, intelligent, active in community service, and had no prior convictions for serious crimes against a person. At the same time, given the defendant's severe alcohol problem, to which the crime was largely attributable, and the prognosis that the defendant was unlikely to benefit from treatment,[35] the court was unable to find that a similar crime would not recur.

■ In light of the nature of Mallott's crime, we cannot say that the sentence imposed was clearly mistaken.

AFFIRMED.

RABINOWITZ, C. J., concurs and dissents.

BURKE, J., did not participate.

RABINOWITZ, Chief Justice, concurring and dissenting.

I disagree with the majority concerning two aspects of the opinion, namely, the prosecution's use of peremptory challenges and the excessiveness of the sentence. But first I offer some observations regarding the superior court's refusal to grant appellant's motion for change of venue.

Concerning the issue of whether the pretrial publicity was sufficient to warrant a finding that Mallott was denied his constitutional right to a fair trial, I am in agreement with the majority that there was no reversible error. The United States Supreme Court in *Murphy v. Florida*, 421 U.S.

---

**35.** This conclusion was based on the pre-sentence report and the fact that Mallott had violated the no-drinking condition of his release on bail.

794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 595 (1975), made clear that defendant's constitutional rights to a fair trial are violated only if the trial jury is shown to be partial. As the majority concludes, the heavy burden placed on the defendant in such cases has not been met in this one. Although the trial jury was not shown to reflect any partiality as a result of pre-trial prejudicial publicity, I conclude that Mallott's motion for a change of venue should have been granted on October 4. At that time, sufficient evidence existed to warrant a change of venue.[1] Although the voir dire did not demonstrate this denial to be reversible error, under the standards stated in the majority opinion, I think inflammatory pre-trial publicity was so great by October 4 that it was sufficient to warrant a change of venue.

As the majority notes:

[C]ourts must always be sensitive to the impropriety of conducting a trial in an atmosphere hostile to a defendant, regardless of a defendant's inability to show actual prejudice. In such cases it is important that the trial court give serious consideration to a pre-voir dire motion to transfer venue.[2]

It is of significance that the court also voiced its approval of the following ABA standard:

A motion for change of venue or continuance shall be granted whenever it is determined that, because of the dissemination of potentially prejudicial material, there is a *substantial likelihood that,* in the absence of such relief, *a fair trial by an impartial jury cannot be had.* . . A showing of actual prejudice shall not be required.[3]

At the time the motion was denied, I think a substantial likelihood existed that a fair trial could not be had because of potentially prejudicial pre-trial publicity.

The publicity given this case was clearly inflammatory. Although the initial incident received little or no media coverage, the case did in fact begin to garner extensive media coverage starting with a July 3, 1976, Anchorage Times front page article under a bold face headline reading "Alleged Rapist Can Go Fishing."[4] This article sparked a heated public debate over Mallott's bail provisions. During voir dire, several of the prospective jurors recalled the substance of the headline. A majority of this court concludes that debate over Mallott's admission to bail did little more than dangle his name before the public.[5] I cannot agree. In the public's debate over proper bail procedures, outrage at the superior court was mixed with outrage and fear over

1. At the conclusion of extensive argument on the pre-trial motion to change venue, the superior court stated:

I cannot say at this time that there's any reasonable likelihood that he cannot receive a fair trial, and I think the proof is when we attempt to get a jury, and I'll withhold any ruling on the matter, and submit the matter to the trial judge to make a decision at the time of the trial, and he will have freedom to change the venue *if it appears to him you cannot get a fair trial.*

2. Majority opinion at 746–747.

3. ABA Standards on Fair Trial and Free Press, Standard 8–3.2(d) (2nd ed. tentative draft 1978) *quoted in* majority opinion at 748 (emphasis added).

4. The text of the article read:

A man charged with raping a three-year-old Anchorage girl has been released by the courts to go fishing.

Jay Byron Mallott, 44, is to return July 19 for a pre-trial hearing in Anchorage Superior Court.

Court records show his bail was reduced from $75,000 to $2,500 so he could afford to post bond and fish the Naknek salmon run.

*The bail reduction order was signed by Anchorage Superior Court Presiding Judge Ralph Moody June 10.*

An additional charge of lewd and lascivious *acts toward a child was dropped May 14, court* records show.

Police reports say Mallott spent the night of May 12 at the East Anchorage home of the *three-year-old's mother.* He allegedly raped the girl at 6 a. m. in front of her three brothers as the mother slept in another room.

One of the boys called police from a neighborhood grocery store, *police said.*

The girl was taken to Providence Hospital May 13 where she underwent surgery.

His trial is set for Sept. 20.

5. Majority opinion at 747 n. 25.

the release of Mallott.[6] The ensuing atmosphere of hostility towards Mallott's release in all probability chilled Mallott's ability to have the facts of his case dispassionately evaluated by an Anchorage trial jury.

Public outrage over Mallott's release on bail became a front page news item and subsequent articles repeated the facts of the rape allegations on an almost daily basis in July. Further, the press reports also included prejudicial material in that they "inaccurately reported the presence of eyewitnesses three times, published a short paraphrase of one of Mallott's incriminating statements, and disclosed somewhat misleadingly the existence of certain pieces of evidence."[7] Further, one account disclosed a portion of Mallott's prior criminal record [8] while another article detailed scientific examinations done of the evidence.[9] The ABA Standards on Fair Trial and Free Press note that attorneys should refrain from making statements to the press as to prior criminal record or any statements made by the defendant, evidence of examinations, and the identity and credibility of prospective witnesses because of their potential danger to a fair trial.[10] Such infor-

6. For example, letters to the editor in the Anchorage Times, July 10, 1976, included the following statements:

> When a three-year-old is raped and her life maybe ruined, why should the man charged with the crime be allowed reduced bail so he can go fishing.
>
> We have just read of Judge Moody's bail reduction. At first, we encountered a feeling of unbelievable horror. My God! We have a two-year-old daughter. Shall we lock her in her room until the trial.
>
> What is wrong with this judge and the court system? Can they be responsible for the safety of every little girl?

A letter to the editor in the Anchorage Times on July 11, 1976, stated:

> It really makes me do a slow burn reading the big headline in the July 3 issue of the Times, "Alleged Rapist Can Go Fishing," and I imagine lots more folks who have baby girls are feeling the same as I.
>
> What do the little brothers feel after watching the episode that took place in front of their eyes, not to mention what the baby went through, and no doubt will leave a mental scar on her for life.

Another letter printed by the Anchorage Daily News stated:

> A middle-aged man sends a girl nearing four years of age to surgery on her sex organs; a nether-netherland "psychiatrist" adjudges him safe; two attorneys and a judge release him on trifling bail; . . . .

7. Majority opinion at 745.

8. The Anchorage Daily News reported on July 7, 1976:

> MERRINER SAID Mallott was a married man with several children who 'has been a responsible citizen.' There was no reason to believe he would not appear at his trial, now scheduled for Sept. 20, or the preliminary hearing, July 19, he said. Because Mallott had no prior record of such assaults, Merriner did not think there were grounds for considering him a danger to the community.

> The Daily News has learned, however, that the accused rapist was arrested here in 1966 for drunkenness; and in 1959 in Nevada for disturbing the peace. In 1955, he was convicted of second-degree burglary in California.

9. This article from the Anchorage Times of July 29, 1976, stated:

> In a recent hearing Moody ruled that the state obtained pubic hair clippings and a penis swab from the accused constitutionally, since there was no time to get a search warrant and the evidence could have been destroyed easily. Rigos had attempted to get that physical evidence suppressed at the trial.

10. ABA Standards on Fair Trial and Free Press, Standard 8–1.1 (2nd ed. tentative draft 1978) provides, in part:

> *Extrajudicial Statements By Attorneys*
> (a) A lawyer shall not release or authorize the release of information or opinion for dissemination by any means of public communication if such dissemination would pose a clear and present danger to the fairness of the trial.
> (b) Subject to paragraph (a), from the commencement of the investigation of a criminal matter until the completion of trial or disposition without trial, a lawyer may be subject to disciplinary action with respect to extrajudicial statements concerning the following matters:
> (i) the prior criminal record (including arrests, indictment, or other charges of crime), the character or reputation of the accused, or any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case;
> (ii) the existence or contents of statement given by the accused, or the refusal or failure of the accused to make any statements;
> (iii) the performance of any examinations or tests, or the accused's refusal or failure to submit to an examination or test;

mation was acquired by the press and reported. Given such reportage, coupled with the inaccuracies and general atmosphere of hostility, a situation existed in early October prior to trial that I think warranted a finding that a substantial likelihood that a fair trial could not be had. In view of the type of pre-trial publicity which was shown and the possibility of prejudice to Mallott's right to receive a fair trial, I think that the preferred procedure was not to defer ruling upon the motion for change of venue until voir dire. Although postponing ruling on such motions may be appropriate in many cases,[11] I think that in this case it was error not to grant the motion at that time. However, as I noted at the beginning, this error was harmless under the federal constitutional standard.

As noted at the outset, I disagree with the majority's conclusion that this case is not an appropriate one in which to decide whether the rule announced by the California Supreme Court in *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), and followed by the Massachusetts Supreme Judicial Court in *Commonwealth v. Soares*, —— Mass. ——, 387 N.E.2d 499 (1979), should be adopted in Alaska. The majority speculates on possible reasons [12] the prosecutor might have preempted the two native venire persons [13] and concludes that "[t]here would have been no occasion to require the state to justify the use of its peremptory challenges in this case even if the *Wheeler* rule were in effect." [14] I disagree. I think that if *Wheeler* were adopted, the state would have to justify its use of peremptory challenges.

The California Supreme Court, in *Wheeler*, established an elaborate procedure for dealing with a claim of impermissible racially motivated peremption. In summary, the court stated that the defendant must raise the issue in timely fashion, make a prima facie showing of group bias, and make a complete record of the circumstances.[15]

---

(iv) the identity, testimony, or credibility of prospective witnesses;

(v) the possibility of a plea of guilty to the offense charged, or other disposition; and

(vi) information which the lawyer knows or has reason to know would be inadmissible as evidence in a trial.

11. ABA Standards on Fair Trial and Free Press, Standard 8–3.3(d) (2nd ed. tentative draft 1978) provides, in part:

If a motion for change of venue or continuance is made prior to the impaneling of the jury, the court may defer ruling until the completion of voir dire.

The commentary noted some dissatisfaction with this position:

Paragraph (d) abandons the recommendation of the first edition that motions for change of venue or continuance be disposed of before the impaneling of the jury. The practice in many jurisdictions is to delay ruling on such motions until after voir dire. This presupposes that voir dire will be an accurate barometer of public sentiment. It also assumes that the failure by the defense to take full advantage of peremptory challenges and challenges for cause reflects the fact that public sentiment is not hostilely aligned against the accused. Neither assumption is self-evident. Thus, it seems undesirable to use voir dire as the primary method of determining the character of the threat to trial fairness and at the same time make it the principal safeguard against such

a threat if it exists. The value of resolving change of venue and continuance motions prior to voir dire, as recommended in the first edition, lies in the preservation of the distinctive advantages of each remedy. Despite the persuasiveness of this reasoning, paragraph (d) has been amended to conform to current practice.

*Id.* at 18. I think that trial courts should not defer ruling automatically but should only in cases of questionable prejudice. When, as in this case, the publicity was substantial and elements of potential prejudicial content clear, deferring a ruling is not appropriate.

12. The majority notes that one prospective juror was previously unsuccessfully challenged for cause because of her acquaintance with the defendant and his relations, and the other could have been but was not challenged for cause under Alaska R.Crim.P. 24(c)(11) for his misdemeanor conviction. Majority opinion at 751.

13. The prosecutor also struck David Williams whose wife is an Alaska Native.

14. Majority opinion at 751–752.

15. The opinion reads in pertinent part:

If a party believes his opponent is using peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima

Assuming arguendo that this court adopted the *Wheeler* rule, the first determination this court must make in applying such a rule is whether the defendant has made a prima facie case of discrimination based on group bias. The only two Native persons in the venire for this case were struck by peremptory challenge. Mallott is a Native. I would think, under the circumstances of this case, that this would be sufficient to establish a prima facie case and shift the burden to the prosecutor since the total exclusion of all members of the race of the defendant is sufficient for a prima facie showing under *Wheeler* and rebuts any presumption that the prosecutor's motives are permissible.[16]

> facie case of such discrimination to the satisfaction of the court. First, as in the case at bar, he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the respective cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias.
>
> We shall not attempt a compendium of all the ways in which a party may seek to make such a showing. For illustration, however, we mention certain types of evidence that will be relevant for this purpose. Thus the party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, under *Peters* [*v. Kiff* (1972) 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83] and *Taylor* [*v. Louisiana* (1975) 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690] the defendant need not be a member of the excluded group in order to complain of a violation of the respective cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.
>
> Upon presentation of this and similar evidence—in the absence, of course, of the jury—the court must determine whether a reasonable inference arises that peremptory challenges are being used on the ground of group bias alone. We recognize that such a ruling 'requires trial judges to make difficult and often close judgments. They are in good position to make such determinations, however, on the basis of their knowledge of local conditions and of local prosecutors.' (Kuhn, *op. cit. supra*, fn. 5, at p. 295.) They are also well situated to bring to bear on this question their powers of observation, their understanding of trial techniques, and their broad judicial experience. We are confident of their ability to distinguish a true case of group discrimination by peremptory challenges from a spurious claim interposed simply for purposes of harassment or delay.
>
> If the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone. The showing need not rise to the level of a challenge for cause. But to sustain his burden of justification, the allegedly offending party must satisfy the court that he exercised such peremptories on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses—i. e., for reasons of specific bias as defined herein. He, too, may support his showing by reference to the totality of the circumstances: for example, it will be relevant if he can demonstrate that in the course of this same voir dire he also challenged similarly situated members of the majority group on identical or comparable grounds. And again we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.
>
> If the court finds that the burden of justification is not sustained as to any of the questioned peremptory challenges, the presumption of their validity is rebutted. Accordingly, the court must then conclude that the jury as constituted fails to comply with the representative cross-section requirement, and it must dismiss the jurors thus far selected. So too it must quash any remaining venire, since the complaining party is entitled to a random draw from an entire venire—not one that has been partially or totally stripped of members of a cognizable group by the improper use of peremptory challenges. Upon such dismissal a different venire shall be drawn and the jury selection process may begin anew.
>
> *People v. Wheeler*, 148 Cal.Rptr. 890, 905–906, 583 P.2d 748, 764–65 (1978) (footnotes omitted).

**16.** In *Wheeler*, the court found a prima facie showing that the prosecutor was exercising

Given that there is a prima facie showing of group bias, the burden then shifts to the prosecutor "to justify his challenges as predicated not on group affiliation, but on individual characteristics specific to each group member excluded." [17] When the procedure is implemented and the initial prima facie showing has been made, it is for the trial court to then allow the prosecutor a chance to rebut the prima facie showing. Such a procedure is not possible in the context of the first case before an appellate court setting forth this new procedure.

The prosecution's motives are a subject that does not lend itself to appellate speculation. Although sufficient justification for a finding of specific bias may exist as the majority suggests, a prosecutor's decision to peremptorily challenge jurors of a particular class may still constitute group exclusion and any proffered rationale may be only a sham. Under *Wheeler*, such matters are to be judged by the trial court which has the opportunity to view the prosecutor and potential jurors during the totality of the jury selection process.

If the court finds that a prima facie case has been made, the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone. The showing need not rise to the level of a challenge for cause. But to sustain his burden of justification, the allegedly offending party must satisfy the court that he exercised such peremptories on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses—i. e., for reasons of specific

bias as defined herein. He, too, may support his showing by reference to the totality of the circumstances: for example, it will be relevant if he can demonstrate that in the course of this same voir dire he also challenged similarly situated members of the majority group on identical or comparable grounds. And again we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.[18]

Such a judgment must be made by the trial court and consideration of the *Wheeler* rule should not be precluded by the majority's speculations as to what rationales the prosecutor might give in support of the questioned challenges. These speculations are based only on the questions asked in voir dire. The state has argued that it was possible that a suggestion of specific bias might be supportable. But no affidavit was submitted by the prosecutor as to the reasons why he challenged these jurors, nor is there other evidence in the record to support these particular contentions made by the state on appeal. Under these circumstances, I think it inappropriate for this court to speculate as to the reasons the prosecutor might have given for employing peremptory challenges in the manner in which he did.

Both the California Supreme Court in *Wheeler* and the Massachusetts Supreme Judicial Court in *Soares* held that the appropriate remedy when a prima facie showing has been made in first impression cases is to grant the defendant a new trial.[19] The

peremptory challenges against black jurors on the ground of group bias, *id.* 148 Cal.Rptr. 890, 583 P.2d at 766, when the prosecutor had excused all black prospective jurors, *id.* 148 Cal. Rptr. 890, 583 P.2d at 752–53, and the case involved an alleged murder of a white by two black defendants was tried before an all-white jury. In *Commonwealth v. Soares*, —— Mass. ——, —— – ——, 387 N.E.2d 499, 517–18 (Mass. 1979), again involved the alleged murder of a white by black defendants, a prima facie showing was made from the peremptory challenge of twelve of thirteen black jurors.

17. *Commonwealth v. Soares*, —— Mass. ——, ——, 387 N.E.2d 499, 518 (1979).

18. *People v. Wheeler*, 148 Cal.Rptr. 890, 906, 583 P.2d 748, 764–65 (1978) (footnote omitted). *See also Commonwealth v. Soares*, —— Mass. ——, ——, 387 N.E.2d 499, 517 (1979).

19. *People v. Wheeler*, 148 Cal.Rptr. 890, 583 P.2d 748, 768 (1978); *Commonwealth v. Soares*, —— Mass. ——, —— – ——, 387 N.E.2d 499, 517–18 (1979).

court in *Soares* pointed out that the matter cannot be remedied by resort to an evidentiary hearing:

In reaching the conclusions that a new trial is required, we have considered carefully, and rejected, the alternative disposition of remanding the matter solely to determine the basis of the prosecutor's exercise of the peremptory challenges in issue. We do not consider this to be a realistic alternative. The trial judge has retired. More significantly, the conditions of the empanelment in issue cannot be easily recreated. The prospective jurors as they appeared at the empanelment will not be before the judge based on the totality of the circumstances as they existed at the critical time, including the demeanor of the prospective black jurors as compared with those of white veniremen. Thus, a crucial factor necessary for the proper exercise of the judge's responsibility to 'distinguish bona fide reasons for such peremptories [sic] from sham excuses belatedly contrived to avoid admitting acts of group discrimination,' *People v. Wheeler, supra* 22 Cal.3d at 282, 148 Cal.Rptr. at 906, 583 P.2d at 765, would be missing.[20]

The California Supreme Court, in a later opinion, also clarified this point:

Although the People suggested at oral argument that the case should be remanded to the trial court to provide the prosecution with an additional opportunity to justify its use of peremptory challenges to exclude all the black jurors

from the petit jury, under identical circumstances in *Wheeler* our court simply reversed the conviction and directed a new trial. (*See id.*, at p. 283 & fn. 30, 148 Cal.Rptr. 890, 583 P.2d 748.) We believe the disposition directed in *Wheeler* is appropriate in light of the infeasibility of accurately probing and assessing the prosecutor's prior motivation at this late date.[21]

Thus, if the court adopted *Wheeler*, I think that it would require a new trial under the facts of this case, and that any speculation by this court as to what reasons the prosecutor could advance are immaterial. It is on these grounds that I disagree with the majority and conclude that we should address the question of whether the *Wheeler* rule should be adopted in Alaska.

Lastly, I disagree with the court's conclusion that Mallott's sentence was not excessive. Mallott received a sentence of thirty years' imprisonment with fifteen years suspended for the crime of raping a three-year-old girl. This is undeniably a heinous crime against the person. Nevertheless, I would hold that the superior court was "clearly mistaken" [22] in entering this severe a sentence, although I am persuaded that a significant period of incarceration is warranted, namely, one well in excess of the ABA's recommended five-year period of incarceration.[23] My reasons are as follows.

Mallott has no prior history of sexual offenses. He had a prior felony record only of property offenses.[24] His sexual assault of the three-year-old girl came during a

---

20. *Commonwealth v. Soares*, —— Mass. ——, —— n.37, 387 N.E.2d 499, 518 n.37 (1979).

21. *People v. Allen*, 23 Cal.3d 286, n.4, 152 Cal. Rptr. 459, n.4, 590 P.2d 30, 35 n.4 (Cal.1979).

22. *See McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

23. ABA Standards Relating To Sentencing Alternatives and Procedures, Standard 2.1(d) (Approved draft, 1968) provides, in part:

Except for a very few particularly serious offenses, . . . the maximum authorized prison term ought to be five years and only rarely ten.

24. Mallot had three prior felony convictions: attempted burglary in 1954, second degree burglary in 1955 and 1963. Mallott had three misdemeanor convictions: disturbing the peace in 1959, and drunkenness and petty larceny in 1966.

period of alcohol intoxication and seems to have been caused by Mallott's severe alcohol addiction. Otherwise, as the majority notes, Mallott "at the time of sentencing was forty-six years old, articulate, intelligent, active in community service . . ."

The sentence rendered is one of the most severe ever appealed to this court for a sexual assault crime. In our only previous consideration of a sentence for statutory rape, we upheld a sentence of ten years.[25] As to the related crime of rape, rape convictions have been appealed in eleven cases and sentences from six to twenty years have been affirmed[26] while lesser terms have been held too lenient.[27] Of the four affirmances of the longest rape sentences, periods of fifteen and twenty years, a present or prior record of sexual offenses was present.[28]

---

25. *Wagner v. State*, 598 P.2d 936 (Alaska 1979) (ten years imprisonment for a continuing sexual relations over a period of several months with an eleven-year-old female in which Wagner had a prior felony record and had suborned the victim's two brothers to participate).

26. *See Torres v. State*, 521 P.2d 386 (Alaska 1974) (20 years concurrent with existing 10-year sentence); *Newsom v. State*, 533 P.2d 904 (Alaska 1975) (15 years); *Newsom v. State*, 512 P.2d 557 (Alaska 1973) (15 years); *Moore v. State*, 597 P.2d 975 (Alaska 1979) (15 years); *Morrell v. State*, 575 P.2d 1200 (Alaska 1978) (eight concurrent 10-year sentence on eight counts); *Coleman v. State*, 553 P.2d 40 (Alaska 1976) (two concurrent 10-year sentences on two counts); *Gordon v. State*, 501 P.2d 772 (Alaska 1972) (10 years); *Ames v. State*, 533 P.2d 246 (Alaska 1975) (eight years); *Nukapigak v. State*, 562 P.2d 697 (Alaska 1977) (six years).

27. *See State v. Lancaster*, 550 P.2d 1257 (Alaska 1976) (on two counts of forcible rape sentenced to two concurrent seven-year sentences with five years suspended; thus, an effective sentence of two years' jail time); *State v. Chaney*, 477 P.2d 441 (Alaska 1970) (two counts of forcible rape and one count of robbery resulting in three concurrent one-year sentences.)

28. *See Torres v. State*, 521 P.2d 386 (Alaska 1974) (previous conviction for lewd and lascivious acts to an eight-year-old and present offense committed while on appeal bond from a 10-year sentence); *Moore v. State*, 597 P.2d 975 (Alaska 1979) (two incidents three days apart each involving abduction of victim in car, rape, and robbery at gunpoint); *Newsom v. State*, 533 P.2d 904 (Alaska 1975) (previous conviction for attempted rape of a young girl); *Newsom v. State*, 512 P.2d 557 (Alaska 1973) (prior history of sexual offenses).