Raymond D. CHEELY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–4108.

Court of Appeals of Alaska.

Oct. 8, 1993.

Rehearing Granted in Part and Opinion
Amended Nov. 2, 1993.

John E. McConnaughy, III, Fortier & Mikko, P.C., and Larry Cohn, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

### OPINION

MANNHEIMER, Judge.

Raymond D. Cheely was convicted of second-degree murder, AS 11.41.110(a)(2), following a jury trial in the Anchorage superior court. He appeals his conviction as well as the 60–year prison term he received. We affirm Cheely's conviction and his 60–year sentence, but we remand this case to the superior court for reconsideration of the restriction on Cheely's parole eligibility.

On the evening of October 19, 1990, Cheely and two friends, Douglas Gustafson and George Kerr, were traveling on the Glenn Highway in Gustafson's AMC Eagle. Cheely was driving; Gustafson sat in the passenger's seat; Kerr sat in the back seat. Gustafson was holding an HK–91 semi-automatic rifle he had recently purchased.[1]

As they were driving, a red Toyota passed them. Cheely thought that the driver of the Toyota had tried to cut him off or rub up against his car. Becoming incensed, Cheely said, "Hey, let's get those

---

1. Gustafson purchased the weapon with money that Cheely, Gustafson, and Kerr stole from Mike's Meats in Eagle River in a burglary a few days before. Information about this prior crime was excluded from Cheely's trial, but, as we discuss later in this opinion, it is relevant to Cheely's motion to change venue and to Cheely's sentencing argument.

guys," or "We'll show you guys." In response, Gustafson said, "Hey, I'm going to shoot that car." A discussion ensued between Cheely and Gustafson about shooting the Toyota.

With the Toyota about 100 yards ahead, Cheely accelerated to 75–80 miles per hour. Gustafson rolled down the passenger window and rested the HK–91 on the ledge, preparing to shoot. As Cheely approached the Toyota, he slowed down to give Gustafson a better shot.

The Toyota had two occupants: the driver, Robert Chamberlain, and a passenger, Jeffrey Cain. Unaware of what was about to happen, Chamberlain prepared to leave the highway at the Muldoon Avenue exit. As Chamberlain slowed down to negotiate the exit ramp, Gustafson fired his rifle at the car. The bullet went through the Toyota's rear window and penetrated Jeffrey Cain's skull, killing him instantly.

Shortly after the shooting, George Kerr told the police what had happened. On November 2, 1990, after further investigation by the authorities, Gustafson was indicted for first-degree murder, AS 11.41.-100(a)(1), and Cheely was indicted for second-degree murder, AS 11.41.110(a)(2). Gustafson came to trial at the beginning of March, 1991. Following a two-week trial, Gustafson was convicted of the lesser included offense of second-degree murder. We affirmed Gustafson's conviction in *Gustafson v. State*, 854 P.2d 751 (Alaska App., 1993).

### Cheely's Motion for Change of Venue

Jeffrey Cain's death and Gustafson's and Cheely's subsequent arrest received significant media attention. Newspaper stories in late 1990 focused on the shooting, and they mentioned another burglary and theft that Gustafson and Cheely had committed a few days before the shooting. On February 13, 1991, six weeks before his trial (and two weeks before Gustafson's trial), Cheely asked the superior court to move his trial to a different venue. *See* AS 22.15.080(1). Presenting the superior court with a compilation of the newspaper articles about the case, Cheely argued that the media publici-

ty made it impossible for him to receive a fair trial in Anchorage.

Gustafson's trial began two weeks later, generating renewed and extensive press coverage. On March 15, 1991, just after Gustafson's trial ended, Cheely supplemented his motion for change of venue with additional newspaper articles that had appeared during Gustafson's trial.

Cheely's trial began at the end of March, only two weeks after Gustafson was convicted. At that time, Cheely's motion for change of venue remained undecided. Although the record is unclear, Superior Court Judge Milton M. Souter apparently decided to defer ruling on Cheely's motion until jury selection was attempted, so as to better gauge the actual effect of the pretrial publicity on the pool of prospective jurors. Following jury selection, Judge Souter denied Cheely's motion for change of venue. On appeal, Cheely argues that the superior court should have changed the venue of his trial because the media coverage made it impossible to pick an impartial jury in the Anchorage area.

### 1. The Media Coverage

In support of his motion to change the venue of his trial, Cheely submitted over two dozen newspaper articles that focused on Cain's death, Gustafson's arrest, Cheely's later arrest, and Gustafson's trial and eventual conviction. Twelve of these articles, from October and November 1990, reported the shooting, the ensuing investigation, and Jeffrey Cain's funeral. The remaining newspaper articles focused on Gustafson's trial (which, as noted above, occurred in early March, 1991, and ended two weeks before Cheely's trial began).

### a. Initial Coverage of the Shooting

The shooting made the front page of the Metro section of the Anchorage Daily News on October 21, 1990. The next day, October 22, Gustafson's arrest was reported on the front pages of both the Anchorage Times and the Anchorage Daily News. Both articles reported that Kerr, a witness to the shooting, had agreed to cooperate

with the police. According to the articles, Kerr told the police that he, Gustafson, and Cheely had been driving to Anchorage, and that Cheely and Gustafson discussed shooting at a passing sports car. When the sports car started to exit the highway, Gustafson picked up his .308 caliber HK–91 semi-automatic assault rifle, pointed the weapon in the direction of the sports car, and fired. Cheely was described as the driver of the vehicle, but the articles did not suggest that Cheely had maneuvered the car to give Gustafson a better shot.

A follow-up article in the Anchorage Daily News again recounted Kerr's description of the shooting. This article reported that, when Kerr was asked to explain why Cheely had been driving Gustafson's car, Kerr stated that Gustafson viewed Cheely as an authority figure. The article also noted that a source described Cheely and Gustafson as "trouble".

An October 25 article in the Chugiak— Eagle River Star quoted a teacher from Chugiak High School who described both Cheely and Gustafson as "gun nuts". This article mentioned that Gustafson might have been involved in the Mike's Meats burglary (see footnote 1), but the article did not tie Cheely to that incident.

Toward the end of October, articles in both the Anchorage Times and the Anchorage Daily News described Cain's funeral and his family's and friends' reactions to his death. Both articles contained pictures of the grieving family at the funeral.

Around the same time, an article in the Anchorage Daily News reported that Gustafson's bail had been doubled to $500,000 because he posed a flight risk. This article reminded readers that Cheely had been driving when Gustafson shot Cain, and (apparently for the first time) reported that both Cheely and Gustafson were suspects in the Mike's Meats burglary in Eagle River. This article stated that Gustafson might have purchased the assault rifle he used to shoot Cain with some of the money stolen from Mike's Meats. This article also reported that Cheely had slowed the car and had changed lanes to give Gustafson a better shot at the Toyota. While the arti-

cle noted that Cheely had not yet been charged in connection with either the burglary or the shooting, the article reported that Cheely was awaiting trial on a charge of stealing a pickup truck. Finally, the article reported that the assault rifle had still not been recovered, and it mentioned that the police believed that Cheely might have moved the rifle from its original hiding place because they found a hammer with Cheely's initials where they had expected to find the weapon.

Cheely's arrest on November 3 made the front page of the Anchorage Times. Anchorage Police Lieutenant Shirley Warner was quoted as saying,

> Murder in the second degree is when you commit an act that is so outrageous you would have to assume it endangers life. Cheely was driving the car. He was slowing down, maneuvering the car in such a way that Gustafson could get a shot off. We're going to get them both: ... Gustafson on first-degree [murder] and Cheely on ... second.

The article further stated that Cheely had also been indicted for tampering with evidence and for interfering with official proceedings, for second-degree theft and second-degree burglary in connection with the break-in at Mike's Meats, and for second-degree assault for threatening a couple who knew about Cheely's involvement in the burglary. The article also asserted that the .308–caliber HK–91 assault rifle had indeed been purchased with some of the $19,000 stolen from Mike's Meats.

A similar article from the Anchorage Daily News reported that Cheely had been charged with second-degree murder for "position[ing] [Gustafson's AMC] Eagle to give Gustafson a good shot at the Toyota," and that a grand jury had also indicted Cheely on charges of tampering with evidence and interfering with official proceedings by concealing the murder weapon. The article reported that Cheely's bail had been set at $500,000, and included a photograph of Cheely in jail garb and shackles. The article also noted that Cheely and Gustafson had been indicted for the burglary

and theft that occurred at Mike's Meats, and that Cheely and Gustafson had assaulted a Mountain View couple who knew of Cheely's and Gustafson's involvement in the burglary.

A November 4 article in the Anchorage Times contained a large photograph of Cheely in handcuffs and jail garb. The article described how, an hour before Cain's shooting, Cheely and Gustafson had threatened Candy Sorenson and Ted Miller at gunpoint because the couple knew about the Mike's Meats burglary. The article reminded readers that, according to Kerr, Cheely and Gustafson had decided to shoot at the Toyota because they thought it had driven too close to them, and that Cheely had maneuvered the car to allow Gustafson a better shot at the Toyota.

After this article, newspaper coverage of the shooting appears to have stopped. The next newspaper article submitted in support of Cheely's motion is a December 25, 1990 article in the Anchorage Daily News which reported that Gustafson's trial had been delayed. The article did not mention Cheely.

### b. *Coverage of Gustafson's Trial*

An article in the Anchorage Daily News reported that Gustafson's defense counsel had asked the superior court to dismiss the first-degree murder charge and to suppress statements made by Gustafson to Kerr in secretly recorded conversations. The article stated that Cheely, Gustafson, and Kerr had stolen $19,000 from an Eagle River meat market, and that they used this money to buy the weapon that killed Cain. The article repeated the circumstances surrounding the shooting.

A related article in the Anchorage Times, reporting Gustafson's suppression motion, also stated that Kerr, Gustafson, and Cheely had burglarized Mike's Meats and had stolen $19,000. The article noted that Gustafson's counsel had asked for separate trials of the murder and burglary cases, asserting that they were unrelated events, but that the State had opposed, arguing that the cases were related because the

proceeds of the burglary had been used to buy the murder weapon.

The Anchorage Times reported George Kerr's testimony during Gustafson's trial. According to the Times article, Kerr testified that Cheely became angry and cursed at the Toyota for trying to rub against Gustafson's car. When Gustafson said that he wanted to shoot the car's tires out, Cheely accelerated to 75 miles per hour to catch the Toyota. The article also stated that Gustafson and Cheely had hidden the HK–91 assault rifle and that it had not yet been recovered.

A similar article in the Anchorage Daily News also reported Kerr's testimony during Gustafson's trial. Although the article focused primarily on Gustafson's involvement in the shooting and Kerr's belated attempts to protect his friends during his testimony, the article reported that Kerr had testified that Cheely became angry with the driver of the Toyota and remarked, "These guys are f[ucking] with us." When Gustafson stated that he was going to shoot at the car, Cheely responded, "Let's get 'em. They're not going to push us around. Let's show those a[sshole]s."

On March 5, 1991, the Anchorage Daily News reported that Kevin Daugharty, Kerr's school counselor, had testified at Gustafson's trial. Daugharty testified that he had been "stunned" when he heard Kerr's recent testimony; Daugharty believed that Kerr had perjured himself because Kerr's testimony differed markedly from what Kerr had told him three days after the shooting. In particular, Daugharty testified that Kerr's earlier statements to him contradicted Kerr's current testimony that Gustafson had merely pointed the assault rifle out of the window without aiming, and that Cheely had never "paced" the Toyota to give Gustafson a better shot. A similar article appeared in the Anchorage Times.

Another Anchorage Daily News article from the same time period focused on

whether Gustafson had acted with intent to kill. The article only mentioned Cheely in passing, but did remind readers that Cheely had been driving the car, had disposed of the murder weapon, and was charged with second-degree murder as an accomplice. The article reported that the jurors at Gustafson's trial were not being told that the assault rifle had been purchased with the proceeds of a burglary.

In a March 12 article, the Anchorage Daily News reported the closing remarks of the prosecution and the defense at Gustafson's trial. The article noted that both sides emphasized the importance of the secretly recorded statements that Gustafson had made to Kerr. Cheely was frequently mentioned in the article as having tipped Gustafson off that Kerr was an informant. The article also mentioned Daugharty's testimony that Kerr told him that Cheely had maneuvered the car to give Gustafson a better shot at the Toyota.

The final article included with Cheely's change of venue motion reported that Gustafson had been found guilty. It also said, "Raymond Cheely, who was driving Gustafson's car during the shooting, sped up as the Toyota was exiting the highway at Muldoon so Gustafson could have a clear shot. Cheely is charged with second-degree murder and is scheduled for trial later this month."

### 2. Jury Selection

Jury selection for Cheely's trial began on March 26, 1991. The court initially summoned 70 potential jurors. Before the prosecution and defense attorneys began their individual voir dire of the prospective jurors, Judge Souter excused 27 prospective jurors. Many of these were excused because of hardship (9) or because they had connections to people involved in the case (4). However, 8 of the 27 were excused because they had formed opinions about Cheely's guilt or innocence from what they had previously heard or read in the media. In addition, 2 more prospective jurors were excused because they had formed opinions

based on conversations and other personal experiences, and another 3 were excused because they had formed opinions based on unstated reasons. The last of the 27 was excused for mental illness.

During the second half of jury selection, the remaining four dozen prospective jurors were questioned individually by the prosecutor and the defense attorney. Before trial, Cheely's attorney had asked the court to grant him additional peremptory challenges beyond the 10 allotted by Alaska Criminal Rule 24(d). This request remained under advisement when the voir dire of individual jurors began. After 17 prospective jurors had been individually questioned by the attorneys, with 12 of them being passed for cause, Judge Souter inquired if the defense attorney still wished additional peremptory challenges. Cheely's attorney answered that he wanted to wait until he could appraise the results of the completed voir dire process:

> DEFENSE ATTORNEY: I still have the request, Your Honor, but I think we should wait until we get further into the peremptory stage and see what happens there, as to whether I use all my peremptory challenges up or not.

The attorneys continued their questioning of individual prospective jurors. By the time court recessed on the fourth day of voir dire, a panel of twelve jurors had been chosen and the selection of alternates had begun. During this process, 45 prospective jurors were individually questioned, and 15 were excused for cause. Of these, 12 were excused primarily because they had formed opinions about the case due to pre-trial publicity. (The court granted every one of Cheely's challenges based on a prospective juror's exposure to pre-trial publicity.) The other 3 prospective jurors were excused for causes unrelated to pre-trial publicity.

Both the prosecution and the defense used their entire normal allotments of peremptory challenges (6 and 10, respectively) during the selection of the twelve-member

jury panel. In addition, as court ended on March 29, the defense exercised its first peremptory challenge of a prospective alternate juror. However, of the 11 defense peremptory challenges, 9 were exercised against prospective jurors who had little or no knowledge of the case from media reports. Only 1 defense challenge appears to have been based on the prospective juror's substantial exposure to media coverage. Another challenge appears to have been based on a combination of media exposure, connection to the parties, strong feelings about gun safety, and the fact that the juror's house had recently been burglarized by teenagers.

As the jury selection process neared its end on the afternoon of Friday, March 29, the court again took up the subject of Cheely's pending motion for additional peremptory challenges. Even though Cheely's attorney had used all 10 of his regular peremptory challenges and had used 1 of his 2 allotted challenges to alternate jurors, he declared that he did not wish any additional peremptory challenges.

Cheely's trial resumed on Monday, April 1, and the selection of alternate jurors was completed. After the twelve regular jurors and three alternates had been seated, Judge Souter denied Cheely's pending motion for change of venue:

> There was a motion to change venue. We spent a full week picking the jury. [The prosecutor] has characterized the court's efforts in that regard as being liberally intended to weed out people who might have any possible reason to be biased by the pre-trial publicity. Indeed, that was my method, my intent. I don't think [the defense attorney] disagrees [that] that was done. The motion to change venue is denied. It appears to me that we indeed were able to get a fair panel of unbiased people, not exposed to substantial pre-trial publicity. And certainly, in instances where they have been exposed, they displayed—under stringent

questioning from defense counsel— ... an ability to set aside the little bit that they remembered and try the case based on the evidence and the law and not on anything else.

In response to Judge Souter's ruling, Cheely's counsel stated:

> [F]or purposes of appellate review, should it go that far, if we don't at least indicate that we want venue changed after jury selection, we [are] deemed to waive it. So, for purposes of the record, we would still request that venue be changed for all the reasons set forth [in our motion and] the results of jury selection. And we'll abide by your ruling at this time.

### 3. *Should Venue Have Been Changed?*

■ On appeal, Cheely renews his argument that the superior court should have changed the venue of his trial. He relies chiefly on *Mallott v. State,* 608 P.2d 737 (Alaska 1980). In *Mallott,* the supreme court recognized that "the voir dire process is not an infallible Geiger counter of juror prejudice" when a criminal case has received intensive pre-trial media coverage; for that reason, the court adopted the standard of the American Bar Association that

> [a] motion for a change of venue ... shall be granted whenever it is determined that, because of the dissemination of potentially prejudicial material, there is a substantial likelihood that, in the absence of such relief, a fair trial by an impartial jury cannot be had.... A showing of actual prejudice shall not be required.

*Mallott,* 608 P.2d at 748.

The highway shooting generated extensive newspaper and television coverage. Moreover, 20 prospective jurors (of a venire of 70) were excused because they had formed opinions about the case based on media coverage.[2] Because of these factors, Cheely's case must be analyzed under

**2.** We note, however, that one of these twenty was excused because, due to his inveterate distrust of the government, he had formed the opinion that Cheely was innocent.

the *Mallott* standard. *Compare Newcomb v. State,* 800 P.2d 935, 938 (Alaska App. 1990).

However, even under *Mallott,* the question is not how many biased prospective jurors were identified and excused; rather, the question is whether there is substantial reason to doubt the impartiality of the jurors who remained after the selection process was complete. *See Newcomb,* 800 P.2d at 938–39. *Mallott* calls upon trial judges to ask whether pre-trial publicity has created a "partiality that [can] not be laid aside" in the jurors ultimately selected to judge the defendant's guilt or innocence. 608 P.2d at 748, quoting *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 595 (1975). Phrased another way, *Mallott* asks judges to determine the likelihood that, despite voir dire, the jury panel "harbor[s] unrevealed prejudices as a result of the publicity". 608 P.2d at 748.

■ Under *Mallott,* when prospective jurors have been exposed to intensive, prejudicial pre-trial publicity, judges need not take those jurors' protestations of impartiality at face value. However, as the facts of *Mallott* illustrate, no change of venue is required when, despite the dissemination of pre-trial publicity, a substantial portion of the prospective jurors have not been exposed to the publicity or, at least, not exposed to its prejudicial aspects. In *Mallott* itself, the supreme court upheld the trial court's refusal to change venue because it appeared, from individual voir dire, that, despite potentially prejudicial pre-trial publicity, more than half of the prospective jurors—and all but two of the jurors ultimately selected to try the case—had not been exposed to the worst aspects of that publicity and had heard only a basic description of the alleged crime. 608 P.2d at 748.

In Cheely's case, the judge and trial attorneys recognized the problem posed by pre-trial publicity, and they therefore engaged in probing, individual questioning of the prospective jurors, aided by an extensive pre-voir dire questionnaire that each prospective juror filled out before coming to court. One fact that emerged from this individual questioning was that, in a large community such as Anchorage, many residents do not follow media coverage of events. *See Newcomb,* 800 P.2d at 939. Of the twelve jurors ultimately selected to decide Cheely's case, only one had read the newspaper coverage of Gustafson's trial. Six other jurors had read the initial newspaper coverage in the fall of 1990. But of these six, one suspected everything he read in newspapers, and another three apparently did not know (until they came to court) that Cheely was involved in the incident. Two jurors said they never read newspapers and had seen only the initial television coverage. One juror had not read or viewed any media coverage, with the exception of glancing at headlines. Finally, two jurors had been out of state when the shooting occurred and knew almost nothing about the case.

In short, it appears that only one member of the jury panel knew much more about the case than a general description of the crime. Several members of the jury were not aware of the allegations against Cheely until they heard the indictment read in court at the beginning of the selection process. And, as noted above, many other prospective jurors were equally untainted by pre-trial publicity. The great majority of Cheely's peremptory challenges (9 of 11) were exercised against prospective jurors who had no more exposure to pre-trial publicity than the twelve jurors ultimately selected.

Because the trial judge is in the best position to evaluate the conduct and results of jury selection, we are to affirm the superior court's denial of Cheely's motion for change of venue unless we are convinced, after an independent review of the record, that the superior court abused its discretion. *Newcomb,* 800 P.2d at 937. From the record we have summarized above, Judge Souter could reasonably con-

clude that pre-trial publicity had made jury selection more difficult but not impossible, and that the jurors ultimately selected did not harbor unrevealed prejudices against Cheely. *Compare Alexander v. State,* 838 P.2d 269, 273 (Alaska App.1992).

We conclude that Judge Souter did not abuse his discretion when he denied Cheely's motion for change of venue.

### The Testimony Concerning Cheely's Out-of-Court Statements

██ Cheely asserts that the trial court should not have allowed the prosecution to introduce evidence of his statement to two friends, Ted Miller and Candy Sorenson, that he was jealous of Gustafson because Gustafson had been the one to fire the rifle. Cheely argues that his remark to Miller and Sorenson should have been excluded under Alaska Evidence Rule 404(a) because it showed Cheely's bad character.

Evidence Rule 404(a) prohibits admission of evidence of a person's character when that evidence is offered "for the purpose of proving that he [or she] acted in conformity therewith on a particular occasion". In other words, Rule 404(a) bars a party from relying on a person's character as circumstantial evidence that the person acted in character during the events being litigated. See the second and third paragraphs of the Commentary to Evidence Rule 404(a).

In Cheely's case, however, the prosecution did not present evidence of Cheely's character (for example, a witness to testify, based upon reputation or opinion, that Cheely was a violent or anti-social person— see Evidence Rule 405) to circumstantially prove that Cheely must have solicited, aided, or abetted Gustafson's shooting of Jeffrey Cain. Rather, the prosecution presented proof of Cheely's own statements about the shooting.

As Judge Souter recognized, Cheely's attitude toward the shooting, demonstrated by his statements that he envied Gustafson, tended to prove an element of the

prosecution's case—that Cheely had acted with intent to promote or facilitate the shooting. Although Cheely's remarks reflected adversely on his character, disparagement of Cheely's character was but a tangential effect of the evidence, not the purpose for which it was admitted.

Testimony that Cheely was jealous of Gustafson's more active role in the shooting was not "character evidence" within the scope of Rule 404(a). Judge Souter did not abuse his discretion when he allowed the prosecution to present this evidence. *Hawley v. State,* 614 P.2d 1349, 1361 (Alaska 1980).

### Admission of the *Glass* Warrant Tape

██ Cheely also argues that the trial judge should have prevented the prosecution from introducing a tape recording and an accompanying transcript of a monitored conversation between Miller, Sorenson, and Cheely.[3] During certain portions of this tape, the conversation is all but indiscernible. Because of this, Cheely argues that the tape had little or no probative value and only encouraged the jury to speculate about incriminating statements Cheely might have made.

The record supports Judge Souter's decision to admit the tape and transcript. The transcript shows that the inaudible portions of the conversation were generally small talk; Cheely's comments about the shooting are clearly discernible. In particular, the taped conversation contains Cheely's suggestions to Miller and Sorenson that George Kerr fired the shot, not Gustafson, that Cheely had told Kerr to use his own gun, but that Kerr had used Gustafson's gun, that Kerr had intended all along to frame Gustafson, and that Gustafson had hidden the gun the next day. Moreover, the prosecution called Sorenson to describe

---

**3.** Miller and Sorenson agreed to help the police investigation by wearing a monitoring device to record a conversation with Cheely, after the police had obtained judicial authorization for this procedure under *State v. Glass,* 583 P.2d 872 (Alaska 1978).

the taped conversation. During Sorenson's testimony, the prosecutor used an overhead projector to display the transcript, while Sorenson explained the context of some of the statements on the tape.

In *Gallagher v. State*, 651 P.2d 1185, 1189–90 (Alaska App.1982), this court stated:

> The rule is well established that partially audible recordings may be admitted, within the discretion of the trial court, if their probative value outweighs their potential for [unfair] prejudice and if the omitted [or inaudible] portions are not so substantial as to render the recording unreliable.

Under this standard, Judge Souter did not abuse his discretion when he admitted the recorded conversation. *See also Suiter v. State*, 785 P.2d 28, 32 (Alaska App.1989).

*Allegation of Juror Misconduct*

■ On Saturday, April 20, 1991, during jury deliberations, Judge Souter convened court and read aloud the following note from the jury:

> Last night one of the jurors drove out the Glenn Highway and Muldoon Road Interchange and drove back and forth between the Ft. Rich interchange and [the Boniface] interchange twice. This juror has not expressed her findings or opinion of what she saw or believed, et cetera, as we stopped her ... the minute she told us she had done it. We would like to know if this trip was permissible or not. If it was, may she discuss her findings with the jury?

In response to this note, the prosecutor and defense attorney agreed on a list of questions to ask the juror. Judge Souter brought the juror into court and questioned her from this list.

The juror told Judge Souter that she had driven from Anchorage to the Fort Rich-

ardson interchange, headed back to Anchorage, then turned around at the Northway Mall and repeated the trip. Her route took her past the Muldoon Avenue freeway interchange twice. She stated that she was pondering the case, "trying to get it straight in my mind, I guess." She added that, during her drive, she "wasn't really looking for anything, because I didn't think there would be anything to look for.... I was just thinking, and I drove it twice and I went home." The juror declared that she had not stopped, looked around for evidence, made any timing tests, or taken any notes or photographs. She said that she observed nothing different from what she had earlier observed when the entire jury was taken to view the spot.

When Judge Souter was done questioning the juror, Cheely's attorney asked her additional questions. The juror assured the defense attorney that she had not made observations about how a car would travel when leaving the freeway to take the exit ramp, nor had she reached any other conclusions about the case. Toward the end of the defense attorney's questioning of the juror, the following exchange occurred:

DEFENSE ATTORNEY: It sounds to me like you were just driving down the highway, thinking about it ...

JUROR: I was.

DEFENSE ATTORNEY: ... and that's about it

. . . . .

JUROR: I was; I was just driving.

DEFENSE ATTORNEY: ... like if you had been driving ...

JUROR: ... down the highway thinking about it. I was just thinking.

DEFENSE ATTORNEY: Similar [to] if you had been thinking about a family member or something like that, that just preoccupied your mind but it didn't—you weren't really paying attention, other than keeping in your lane and making sure you didn't hit anybody?

JUROR: Right.

DEFENSE ATTORNEY: Okay.

. . . . .

DEFENSE ATTORNEY: It sounds to me like you're the kind of person who likes to go on a drive to ... think about some important things

...

JUROR: Think.

DEFENSE ATTORNEY: ... and that's your way of getting away from people and thinking about it, and you just happened to do the highway out that way.

At the end of the questioning, the juror was excused from the courtroom and Judge Souter asked the parties if they objected to the juror's remaining on the panel and continuing deliberations. The following colloquy ensued:

DEFENSE ATTORNEY: Judge, just for the purpose of preserving the record, we would move for a mistrial.

THE COURT: On what basis?

DEFENSE ATTORNEY: Based on her going out and doing some sort of investigation. That's all I have to say.

THE COURT: It doesn't appear to me that she did any investigation whatsoever. Motion for mistrial is denied.... I totally believe what she said. I think she was completely forthright with us. I don't think she was attempting to hide anything.

■ On appeal, Cheely contends that Judge Souter failed to conduct a sufficiently thorough inquiry into the juror's actions. However, the record demonstrates that Cheely's counsel approved of the court's approach to the matter throughout. The defense attorney did not suggest, as Cheely does now, that the trial court must employ a rebuttable presumption that the juror was improperly influenced, nor did Cheely's attorney take the opportunity to ask how the jury panel had become aware of the single juror's drive down the highway. Indeed, when he sought a mistrial, Cheely's attorney did not suggest that the court's inquiry had been inadequate. In-

stead, Cheely's attorney argued that the existing record showed that the juror had, despite her assurances, conducted some sort of investigation into the facts of the case. Thus, Cheely failed to preserve his present assertion that Judge Souter failed to inquire fully into the incident. Alaska Evidence Rule 103(a)(1).

More important, the question of what exactly the juror did—particularly, whether she independently investigated the case or instead simply drove her car and thought— is an issue of fact. In the trial court, Cheely contended in cursory fashion that the juror's answers demonstrated that she had conducted an improper personal investigation of the case. However, the defense attorney's questioning of the juror (quoted above) suggested just the opposite; the defense attorney's leading questions to the juror suggest that he accepted her innocent explanation of the incident. Moreover, Judge Souter clearly accepted the juror's statements as embodying the truth of the occurrence. He explicitly found that the juror had not engaged in any misconduct, and that finding must be upheld on appeal unless it is clearly erroneous. On this record, it is not.

Judge Souter did not abuse his discretion when he denied Cheely's motion for mistrial. *Swain v. State,* 817 P.2d 927, 930 (Alaska App.1991), citing *West v. State,* 409 P.2d 847, 852 (Alaska 1966).

### Sentencing Issues

■ Second-degree murder is an unclassified felony with a minimum term of 5 years' imprisonment and a maximum term of 99 years' imprisonment. AS 12.55.-125(b). Judge Souter sentenced Cheely to 60 years in prison, and exercised his authority under AS 12.55.115 by restricting Cheely's eligibility for parole until Cheely had served 25 years. (Under AS 33.16.-100(d), Cheely would otherwise be eligible

for parole after serving "one-third of the period of confinement imposed".)

Noting that the benchmark sentencing range for second-degree murder is 20 to 30 years, *Page v. State*, 657 P.2d 850, 855 (Alaska App.1983), Cheely argues that his 60–year sentence is excessive. However, Judge Souter found that Cheely's crime was among the worst second-degree murders. Judge Souter concluded that Cheely, without any provocation whatsoever from the victims, had incited Gustafson to shoot at them:

> THE COURT: [I]t's difficult to talk about [one] murder being worse than another murder. But, indeed, one can categorize them, and, considering the aspects which I've already reviewed here, it's clear to me that this murder, totally unprovoked, [of an] unsuspecting person, and committed in a way that, in a very real sense, threatened us all by its very random nature, is among the very worst that could be possibly be done as a second-degree murder.

> . . . . .

> There was plenty of time to think about what was going on. I am convinced, from the trial testimony that I heard and observed, that Raymond Cheely, Jr., not only incited this thing, [but] he created this whole incident out of whole cloth. The other car did nothing wrong. It was Ray Cheely, Jr., that invented an incident out of whole cloth, and then he incited Gustafson to take part in the scheme of events that came about. And then, Ray Cheely, Jr., sped up to catch the other car. And I am absolutely convinced that, when they got near the Muldoon overpass, that he synchronized the speed of his vehicle with the speed of the victim's vehicle. Counsel can argue to me all year long that Mr. Cheely did not pull the trigger. Indeed, he did not, but he ... played a very direct role in the commission of this murder. . . . He is fully as culpable as Gustafson.

In essence, Judge Souter found that Cheely had instigated a random homicide. Judge Souter also found that Cheely showed no remorse for his actions. Because the record supports Judge Souter's finding that Cheely's crime was among the worst second-degree murders, a sentence exceeding the *Page* benchmark was appropriate.

In addition to finding Cheely's crime to be among the worst second-degree murders, Judge Souter also found (based on the prosecution's presentation at sentencing) that Cheely (1) had planned and executed the burglary of Mike's Meats and the ensuing theft of $19,000; (2) had sexually assaulted a young woman; (3) had stolen dynamite; (4) had threatened Miller and Sorenson because they knew he and Gustafson were involved in the Mike's Meats burglary; (5) had attempted to rob a McDonald's restaurant; and (6) had discussed murdering a friend's father. Finally, Judge Souter found that Cheely had played a leadership role with respect to Gustafson and Kerr. For all these reasons, Judge Souter found that Cheely was among the worst class of offenders. For this added reason, Judge Souter could exceed the *Page* benchmark in imposing Cheely's sentence.

Cheely argues that, when Judge Souter determined Cheely's term of imprisonment, he placed disproportionate weight on the various other crimes that the State proved at Cheely's sentencing. The record does not support Cheely's assertion. Leaving aside Cheely's other crimes, Judge Souter had already concluded that Cheely's instigation of the shooting in this case constituted one of the most serious forms of second-degree murder. It is true that Judge Souter found Cheely to be a worst offender based in part on the other crimes proved at sentencing. Nevertheless, despite having found Cheely to be a worst offender, Judge Souter refrained from imposing a maximum sentence. We conclude

that Judge Souter did not place inappropriate weight on Cheely's other crimes.

We further conclude that Cheely's sentence of 60 years' imprisonment is not clearly mistaken. Judge Souter found that Cheely had committed one of the worst second-degree murders and that, based on this crime and other criminal acts, Cheely was a particularly dangerous offender. He also concluded that Cheely's prospects for rehabilitation were uncertain. Based on these findings, Judge Souter concluded that Cheely's sentence primarily had to emphasize the sentencing goals of deterring Cheely and isolating him from society, with secondary emphasis placed on the goals of deterring others and reaffirming societal norms. Judge Souter's conclusions are supported by the record, and it was his responsibility to assess the applicability of the various sentencing goals to the facts of Cheely's case. *Asitonia v. State*, 508 P.2d 1023, 1026 (Alaska 1973). In sum, we find that Judge Souter's sentencing decision is not clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

██ Cheely's final claim on appeal is that Judge Souter erred when he restricted Cheely's parole eligibility. As noted above, Cheely would normally be eligible for discretionary parole after serving one-third of his 60–year sentence. AS 33.16.100(d). Judge Souter, however, denied Cheely parole eligibility until he had served 25 years of the 60–year sentence. The judge reasoned that "a decent respect for human life, the need to deter others, [and] the need to reaffirm societal norms, to express community condemnation for what occurred here, requires that this young man spend a substantial period of time in prison."

Both Cheely and the State assert that Judge Souter misunderstood the amount of time that Cheely normally would have to spend in jail before becoming eligible for parole. The parties' disagreement with the superior court involves the construction of two statutes, the parole eligibility statute and the good time credit statute. The parole eligibility statute, AS 33.16.100(d),

states that a defendant convicted of second-degree murder must serve at least one-third of his or her period of confinement before becoming eligible for discretionary parole. The good time credit statute, AS 33.20.010(a), states that a prisoner sentenced to a term of more than 3 days "is entitled to a deduction of one-third of the term of imprisonment[,] rounded off to the nearest day[,] if the prisoner follows the rules of the correctional facility in which the prisoner is confined."

Reading the parole eligibility statute in conjunction with the good time credit statute, Judge Souter determined that Cheely would be deemed to have served one-third of his 60–year sentence (and thus be eligible for parole) when his actual time in prison augmented by his accrued good time credit equaled 20 years—that is, when Cheely had spent 13 years and 4 months (two-thirds of 20 years) in jail. Based on this interpretation, Judge Souter restricted Cheely's parole eligibility until he had "served" 25 years—or, using a similar calculation, until Cheely had actually spent 16 years and 8 months in jail.

Although neither the State nor Cheely objected to Judge Souter's statutory interpretation in the trial court, both parties now insist that Judge Souter misinterpreted the statutes. They argue that good time credit does not affect parole eligibility under AS 33.16.100(d)—that parole eligibility is triggered by the amount of time a prisoner spends in actual confinement, unmodified by the good time credit the prisoner may have accrued. However, both Cheely and the State deal with this issue in a single paragraph of their briefs; their arguments are both short and conclusory. Neither party asserts that the Department of Corrections or the Parole Board interprets these statutes any differently from Judge Souter.

We are not prepared to definitively interpret the relationship between AS 33.16.-

100(d) and AS 33.20.010(a) in this case. Nevertheless, parties have failed to convince us that Judge Souter wrongly interpreted the interplay between the parole eligibility statute and the good time credit statute. Because, as explained below, we are remanding this case to the superior court for reconsideration of the parole eligibility restriction, the parties will have the opportunity to again address this issue if they wish.

 We turn now to Cheely's argument that Judge Souter had insufficient reason to restrict his parole eligibility. When a sentencing judge restricts parole eligibility, the judge must set forth with particularity his or her reasons for concluding that the parole eligibility prescribed by AS 33.16.090 and AS 33.16.100(c)–(d) is insufficient to protect the public and insure the defendant's reformation. *Newell v. State*, 771 P.2d 873, 876 (Alaska App.1989), quoting *Spencer v. State*, 642 P.2d 1371, 1377 (Alaska App.1982); *see also Stern v. State*, 827 P.2d 442, 450 (Alaska App.1992). When the defendant's sentence is lengthy, as in Cheely's case, Alaska law presumes that questions of discretionary release are better left to the Parole Board, since the Board evaluates the advisability of parole release in light of the defendant's tested response to Department of Corrections rehabilitative measures. *Lawrence v. State*, 764 P.2d 318, 321–22 (Alaska App.1988). However, because the Alaska legislature has affirmatively given sentencing judges the power to restrict or deny parole eligibility, this presumption (that parole release of long-term prisoners should normally be evaluated after the defendant has established an institutional history) must remain rebuttable. *Stern*, 827 P.2d at 450; *Bloomstrand v. State*, 656 P.2d 584, 591 (Alaska App.1982).

 In Cheely's case, Judge Souter stated that his reasons for restricting Cheely's parole eligibility were to insure that Cheely spent enough time in prison to satisfy the sentencing goals of deterring others and reaffirming societal values. However, as *Stern, Newell,* and *Bloomstrand* indicate, restrictions on parole eligibility must be premised on different sentencing goals; they must rest on a finding that normal parole eligibility would be "insufficient to protect the public and insure the defendant's reformation". *Stern*, 827 P.2d at 450.

The State argues that Judge Souter was skeptical of Cheely's prospects for rehabilitation, and portions of the record support the State's assertion. However, because Judge Souter did not specifically find that normal parole eligibility would be insufficient to protect the public and insure Cheely's reformation, we conclude that the superior court must reconsider its decision to restrict Cheely's parole. On remand, the superior court should delete the parole eligibility restriction unless it affirmatively finds that Cheely's normal parole eligibility under AS 33.16.100(d) is insufficient to protect the public and achieve Cheely's rehabilitation.[4]

### Conclusion

We AFFIRM Cheely's conviction and his 60–year sentence. However, we REMAND this case to the superior court for reconsideration of the restriction on Cheely's parole eligibility.

4. We additionally note one aspect of Cheely's sentence that apparently should be modified. Judge Souter announced that the first 7 years of Cheely's sentence were "presumptive". The written judgement echoes this categorization, declaring that Cheely's sentence is "partially presumptive" and that he "is ineligible for parole, except as provided in AS 33.16.090(b) and (c)." This is not correct. Sentences for second-degree murder are not presumptive. AS 12.55.-125(b); *Gustafson v. State*, 854 P.2d 751, 763 (Alaska App., 1992); *Weitz v. State*, 794 P.2d 952, 957 n. 3 (Alaska App.1990). Cheely's eligibility for parole is governed by AS 33.16.100(d), not AS 33.16.090(b)–(c).