NOTICE

*The text of this opinion can be corrected before the opinion is published in the* Pacific Reporter. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| GARY LYNN JOHNSON,<br><br>Appellant,<br><br>v.<br><br>STATE OF ALASKA,<br><br>Appellee. | Court of Appeals No. A-11494<br>Trial Court No. 1CR-12-035 CR<br><br>O P I N I O N<br><br>No. 2544 — February 24, 2017 |

Appeal from the Superior Court, First Judicial District, Craig, David V. George, Judge.

Appearances: Andrew Steiner, Bend, Oregon, for the Appellant. Eric A. Ringsmuth, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge.[*]

Judge MANNHEIMER.

In February 2012, Gary Lynn Johnson was convicted of second-degree stalking based on his contacts with a young boy. At Johnson's sentencing, the judge

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

imposed a probation condition that prohibited Johnson from contacting the boy again. In addition, an earlier protective order obtained by the boy's mother likewise prohibited Johnson from contacting the boy. But two days after Johnson was sentenced, he encountered the boy at a local store, and he initiated contact with him.

Based on this conduct, Johnson was convicted of three new crimes: first-degree stalking, first-degree unlawful contact, and violation of a protective order. [1] Johnson appeals these convictions on three grounds.

First, Johnson asserts that the superior court should have moved his trial out of Craig because of negative pre-trial publicity and local prejudice against him. Next, Johnson asserts that the trial judge committed error by allowing the jury to hear evidence of Johnson's prior conviction in the State of Washington for child molestation. Finally, Johnson contends that the evidence presented at his trial was legally insufficient to support his conviction for first-degree stalking.

For the reasons explained in this opinion, we reject Johnson's arguments regarding the venue of the trial and the admission of his prior conviction. However, Johnson is correct that the evidence presented at his trial was insufficient to support a conviction for first-degree stalking. We therefore reverse that conviction.

*Underlying facts*

Gary Johnson met twelve-year-old M.H. in 2011. Over the next several weeks, Johnson spent time with M.H. — sometimes alone, and sometimes with another boy. Sometimes they would play with paintball guns, and other times they would just

---

[1] AS 11.41.260(a), AS 11.56.750(a), and AS 11.56.740(a), respectively.

drive around. At one point during this time, Johnson told M.H. that he would think about M.H. when he masturbated. (Johnson later claimed that this was meant as a joke.)

After a few weeks, Johnson started giving M.H. presents. These presents included a cell phone. M.H. began exchanging text messages with Johnson using this cell phone, but M.H. only had the phone for a day or two before it was turned over to the police.

The cell phone was turned over to the police after M.H. showed the phone to his aunt and two cafeteria employees at his middle school. After these adults learned that Johnson had given a phone to M.H., school officials contacted M.H.'s mother. They told her about the phone, and about the fact that M.H. had been spending time with Johnson. As a consequence, the school principal held a meeting with M.H.'s parents and Robert Ely, the chief of the Craig Police Department. M.H. attended this meeting too, and during this meeting, M.H.'s cell phone was turned over to Chief Ely.

Following this meeting, M.H.'s mother searched the Internet for information about Johnson. According to her later testimony, she discovered that Johnson had been convicted in Washington for molesting an eleven-year-old boy. M.H.'s mother told M.H. about her discovery, and she sent him out of town for about a month to keep him away from Johnson.

In the meantime, Chief Ely began using M.H.'s cell phone to send text messages to Johnson. In these texts, Ely pretended to be M.H. The exchange of texts lasted for about three weeks, from September 20 to October 9, 2011. According to Ely's later testimony, he conducted this exchange of texts with Johnson in order to determine what "Johnson's intent was".

(Many of these text messages between Ely and Johnson were read to the jury at Johnson's trial, and a print-out of the complete exchange was admitted into evidence.)

Although very few of these text messages have any specific relevance to the issues raised in the present appeal, one of these text messages figured prominently in the prosecutor's theory of how Johnson committed the crime of stalking. This was a text sent by Johnson on October 9, 2011 in which he tried to get M.H. to come over to his house. In response to this text, Chief Ely had one of his officers conduct a traffic stop of Johnson and tell him to have no further contact with M.H.

A few minutes after this traffic stop, Johnson initiated a series of text messages to M.H.'s phone. Based on the content of these text messages, it appears that Johnson first suspected that M.H.'s mother had taken possession of the phone, and that Johnson then suspected (correctly) that the police had the phone. But by later that evening, Johnson was sending text messages indicating he thought M.H. might still have the phone.

The next day, Johnson was arrested and charged with second-degree stalking under AS 11.41.270(a). While this charge was pending, M.H.'s mother obtained a protective order that prohibited Johnson from contacting M.H. or any other member of their immediate family.

Johnson ultimately pleaded guilty to the second-degree stalking charge, and he was sentenced on February 21, 2012. Among the provisions of Johnson's sentence was a condition of probation that prohibited him from contacting M.H. again.

Johnson was released from custody following his sentencing hearing. Two days later, on February 23rd, Johnson drove to the Black Bear store in Klawock. There, he encountered M.H., who had come to the store to pick up a newspaper.

When M.H. walked out of the store, he saw Johnson sitting in his truck. Johnson stuck his head out of the window and yelled to M.H. He told M.H. that he had ruined his life, and he called M.H. a "prick". Johnson then drove his vehicle in M.H.'s direction, but before reaching M.H. he turned and drove away.

M.H. testified that, following this encounter at the Black Bear store, he was nervous and scared, and he wanted to leave the island (*i.e.*, Prince of Wales Island).

Johnson was soon arrested and charged with first-degree stalking, as well as violation of a protective order (the protective order obtained by M.H.'s mother) and first-degree unlawful contact (*i.e.*, contact with M.H. in violation of Johnson's conditions of probation).

Following a jury trial, Johnson was convicted on all counts.

*Whether the superior court abused its discretion when it denied Johnson's motion for a change of venue*

The community of Craig, where Johnson's offenses occurred, is a town on Prince of Wales Island. At the time of this case, Craig had a population of about 1400 people.

As we explained earlier in this opinion, Johnson's interactions with M.H. came to light in September 2011, when M.H. told his aunt and the school employees about the cell phone that Johnson had given him. This quickly led to a school meeting with M.H.'s parents and the chief of police. The principal of the school also sent a letter to all the other school parents, warning them about Johnson. Other people posted warnings about Johnson on the Internet. And a petition was circulated to bar Johnson from a particular trailer park.

The record in Johnson's case does not contain any details of the warnings posted on the Internet, and the record shows that only two of the prospective jurors were aware of the petition that was circulated to bar Johnson from a particular neighborhood. The only generally circulated piece of pre-trial publicity that we can meaningfully

analyze (based on the existing record) is the letter that the principal of the Craig Middle School sent to parents of students attending that school.

According to the description offered by Johnson's defense attorney, this letter had a picture of Johnson on it, and the words, "Stranger Danger". The letter indicated that Johnson had a prior sex offense. Although this letter was sent only to middle school parents, people distributed it more widely — posting it on telephone poles, on bulletin boards, and on Facebook.

Johnson's trial took place in September 2012, one year after this letter was sent. It is unclear, from the record, how long the principal's warning letter remained posted on community bulletin boards, or how often the letter was re-posted to Facebook.

The superior court called 124 prospective jurors for Johnson's trial. Of these, only 71 (slightly more than half) were questioned during the jury selection process.

Based on the general and individual juror questioning, 33 of the 71 prospective jurors were excused. This left 38 prospective jurors. Each party exercised their 11 peremptory challenges.[2] The trial judge then seated a jury consisting of 12 regular jurors and 2 alternates.

After the completion of jury selection, Johnson's attorney asked the superior court to move Johnson's trial out of Craig, based on the community dissemination of information that we have described.

The trial judge denied this motion. With respect to the principal's letter, the judge noted that, of the jurors who knew about this letter, many did not remember any of the details contained in the letter. The judge also pointed out that evidence of

---

[2] *See* Alaska Criminal Rule 24(d) (giving each party 10 peremptory challenges for regular jurors) and Criminal Rule 24(b)(1)(B) (giving each party an additional peremptory challenge if the trial judge intends to seat one or two alternate jurors).

Johnson's prior conviction was going to be admitted at trial. Thus, even if some of the jurors knew about this prior conviction beforehand, this would not appreciably affect the fairness of the trial.

On appeal, Johnson challenges the trial judge's decision to keep the trial in Craig. Quoting what our supreme court said in *Mallott v. State*, Johnson argues that the questioning of prospective jurors during the selection process "is not an infallible Geiger counter of juror prejudice."[3] Johnson contends that, given the amount of pre-trial discussion in the community, the jurors who decided his case must have had hidden prejudices against him — prejudices that made his trial unfair.

But as this Court explained in *Cheely v. State*, 861 P.2d 1168 (Alaska App. 1993), the ultimate question is not strictly the amount of potentially prejudicial publicity disseminated in the community, but rather whether it is possible to select a jury whose members have not been prejudiced by that publicity — or, as we phrased the test in *Cheely*, whether there is "substantial reason to doubt the impartiality of the jurors who remain[] after the selection process [is] complete." *Id.*, 861 P.2d at 1175.

Indeed, in *Mallott* itself, our supreme court upheld the trial judge's refusal to change the trial venue despite potentially prejudicial publicity. The questioning of the prospective jurors in *Mallott* showed that more than half of them — and all but two of the jurors ultimately selected to try the case — "had not been exposed to the worst aspects of that publicity and had heard only a basic description of the alleged crime." See *Cheely*, 861 P.2d at 1175, describing the decision in *Mallott*, 608 P.2d at 748.

In Johnson's case, only 36 of the 71 prospective jurors who were questioned in court had heard *anything* about Johnson's case. And according to the results of the jury voir dire summarized in Appendix A to Johnson's brief, only 26 of the

---

[3] 608 P.2d 737, 748 (Alaska 1980).

prospective jurors had any substantive (*i.e.*, potentially prejudicial) knowledge of the case.

This means that 45 of the 71 prospective jurors who were questioned in court — more than 60% — had not heard anything arguably prejudicial about Johnson. And even among the 26 prospective jurors who Johnson identifies as having heard prejudicial information about his case, at least 7 of these heard only bare allegations or very limited facts. Moreover, the most potentially prejudicial information was the fact that Johnson had a prior conviction for child molestation — and the judge had already ruled that evidence of this prior conviction could be admitted at Johnson's trial.

We therefore conclude that the trial judge did not abuse his discretion when he ruled that the pre-trial publicity in Johnson's case did not require a change of venue.

Finally, Johnson argues that, leaving aside the pre-trial publicity, the trial judge committed error by failing to take account of "[the] many close connections between the [prospective jurors] and the people involved with the case."

But in making this argument, Johnson relies almost entirely on the relationships between several of the prospective jurors and two members of the local community: a father and son who were only peripherally involved in this case, and who did not testify at Johnson's trial. Even though about one-third of the prospective jurors knew this father and son, Johnson has failed to demonstrate how this would have prejudiced the jury's deliberations.

Johnson also points out that about one-third of the prospective jurors knew one or more of the investigating officers in this case. But again, Johnson has failed to demonstrate why this would be a reason for the trial judge to distrust the jury's ability to decide the case fairly.

Under our law, trial judges are given substantial discretion in granting or denying a request for a change of venue based on pre-trial publicity.[4] The pre-trial publicity in this case was potentially prejudicial. But based on the results of the jury voir dire, and based on the fact that evidence of Johnson's prior conviction was going to be admitted at trial, the trial judge could reasonably conclude that Johnson could get a fair trial in Craig. We therefore uphold the trial judge's denial of Johnson's request for a change of venue.

*Whether the trial judge erred by allowing the State to introduce evidence of Johnson's prior conviction for child molestation*

At Johnson's trial, the State was permitted to introduce evidence of Johnson's 1994 conviction in the State of Washington for child molestation. This evidence was introduced through the testimony of M.H.'s mother, who explained that she had researched Johnson on the Internet and had discovered this prior conviction. The trial judge ruled that this evidence was relevant to establish one of the elements of the stalking charge.

As we have explained, Johnson was charged with first-degree stalking. The basic crime of stalking (second-degree stalking) is defined as "knowingly engag[ing] in a course of conduct that recklessly places another person in fear of death or physical injury, or in fear of the death or physical injury of a family member." AS 11.41.270(a).

(Johnson was charged with first-degree stalking because M.H. was under the age of 16. *See* AS 11.41.260(a)(3).)

---

[4] *See, e.g., Harmon v. State*, 193 P.3d 1184, 1200 (Alaska App. 2008); *Newcomb v. State*, 800 P.2d 935, 937 (Alaska App. 1990).

To prove this crime, the State had to establish that Johnson's course of conduct placed M.H. in fear of death or physical injury. The trial judge concluded that Johnson's prior conviction for child molestation was relevant to the proof of this element because it potentially formed part of the basis for M.H.'s fear of Johnson. (M.H.'s mother had informed him of the conviction.)

The trial judge also gave the jurors a cautionary instruction concerning this evidence. The judge told the jurors that they were only allowed to consider "what effect [M.H.'s] knowledge or belief that there was a prior conviction had on any fear he may have had." The judge reminded the jurors that it was up to them whether to accept or reject the testimony — but if they did accept it, "[they could] only consider it for that very limited purpose." The judge concluded the cautionary instruction by telling the jurors, "It would be entirely improper for you to consider that evidence for any other purpose, and certainly entirely improper to convict a defendant simply because there was a prior conviction."

We agree with the trial judge that M.H.'s knowledge of Johnson's prior conviction was relevant to establish why M.H. might have been placed in fear of death or injury by Johnson's conduct.

In his brief to this Court, Johnson essentially concedes that M.H.'s knowledge of Johnson's prior conviction might reasonably have placed M.H. in fear of unwanted sexual contact, but Johnson argues that his prior conviction could not have placed M.H. in fear of injury.

But Johnson takes too narrow a view of how M.H.'s knowledge of the conviction might have affected him. As the prosecutor pointed out when this matter was litigated in the superior court, M.H.'s knowledge of Johnson's prior conviction was important in explaining the fear that M.H. felt because of his encounter with Johnson at the Black Bear store.

*Prosecutor*: [M.H.] sees Mr. Johnson as a sex pervert who's trying to groom him to have sex with him. And [Johnson] got caught; he got convicted; he's in jail. [And then] he gets released ... . And I think [on] the first day [that Johnson has] actually been out, he confronts [M.H.] in the parking lot.

As we explained earlier, Johnson yelled at M.H. in the parking lot, telling him that he had "ruined [Johnson's] life", and then he drove his car toward M.H. We agree with the trial judge that M.H.'s knowledge of Johnson's prior conviction was relevant to explain the nature and extent of M.H.'s fear arising from this encounter — and, specifically, why M.H. might reasonably fear that Johnson would try to cause him physical injury.

Johnson next argues that even if the challenged evidence was relevant, its relevance was outweighed by the risk that it would engender unfair prejudice in the minds of the jurors. But when the trial judge made his ruling on this issue, he explicitly acknowledged the risk of prejudice. Because of this risk, the judge decided to give the cautionary instruction that we described above. The judge gave the jurors a similar instruction after M.H.'s mother testified, and again at the close of the evidence (with the other jury instructions).

When a judge decides to allow evidence to be admitted after weighing the probative value of the evidence against its potential for unfair prejudice, we review the judge's decision under the "abuse of discretion" standard of review. Under this standard, we will not reverse the judge's ruling unless the judge's reasons for reaching that decision "are clearly untenable or unreasonable". [5]

---

[5] *Sylvia L. v. Office of Children's Services*, 343 P.3d 425, 430-31 (Alaska 2015); *Bailey* (continued...)

Given the facts of this case, the trial judge's decision to admit evidence of Johnson's prior conviction, accompanied by repeated cautionary instructions, was not "clearly untenable or unreasonable". We therefore uphold that decision.

*Whether the evidence presented at Johnson's trial was legally sufficient to support his conviction for stalking*

To prove that Johnson was guilty of stalking M.H. as defined in AS 11.41.-270(a), the State was required to prove

- that Johnson engaged in a "course of conduct" — *i.e.*, that he engaged in repeated acts of non-consensual contact with M.H. or a member of M.H.'s family; [6]

- that Johnson's repeated acts of non-consensual contact caused M.H. to reasonably fear death or physical injury; and

- that Johnson acted recklessly as to whether his course of conduct would have this result — *i.e.*, that Johnson consciously disregarded a substantial and unjustifiable risk that his repeated acts of non-consensual contact would have this result. [7]

Johnson's conduct in this case can be divided into three parts.

The first part of Johnson's conduct consisted of several weeks of *consensual* interactions between Johnson and M.H. after they first met. Although M.H.

---

[5] (...continued)
*v. Lenord*, 625 P.2d 849, 854 (Alaska 1981); *State v. Alexander*, 364 P.3d 458, 466 (Alaska App. 2015).

[6] *See* AS 11.41.270(b)(1).

[7] *See* AS 11.41.270(a) and AS 11.81.900(a)(3) (the definition of "recklessly").

testified that Johnson occasionally said some inappropriate things during those weeks, M.H. never asserted that his interactions with Johnson during this time were anything but consensual. Nor did M.H. assert that Johnson's behavior during those weeks caused him to fear injury or death.

Those weeks of consensual interactions ended when M.H. showed his new cell phone (the one Johnson gave him) to his aunt and to the two cafeteria employees at his school. As we explained earlier in this opinion, after M.H. disclosed that he had received a cell phone from Johnson, school officials contacted M.H.'s mother. They told M.H.'s mother about the phone, and about the fact that M.H. had been spending time with Johnson. This led to a meeting between the school principal, M.H.'s parents, and the chief of police.

At this meeting, Chief Ely took custody of M.H.'s cell phone. And following this meeting, M.H.'s mother searched the Internet for information about Johnson. She discovered that he had been convicted in Washington for molesting an eleven-year-old boy, and she told M.H. about this conviction.

When, at Johnson's trial, M.H. was asked how he felt when his mother told him about Johnson's prior conviction for molesting a child, he answered, "It was scary, I guess." This answer implied that M.H.'s new knowledge of Johnson's criminal history caused him to retrospectively re-evaluate his weeks of *consensual contacts* with Johnson.

In his testimony, M.H. did not clarify why he described this new knowledge as "scary". But there is nothing to indicate that, at this time, M.H. was scared that Johnson might kill him or cause him physical injury. Of the inferences that might be drawn from M.H.'s description, the one most favorable to the State is that M.H. was scared because, in retrospect, he thought that Johnson might have intended to sexually molest him.

Viewing the events in this case up to this point, there was insufficient proof to establish the crime of stalking. This evidence did not establish that Johnson engaged in any acts of *non-consensual* contact with M.H., nor did this evidence establish that M.H. was afraid that Johnson might kill or injure him.

The second part of Johnson's conduct in this case was the series of text messages that Johnson exchanged during the next three weeks with the Craig chief of police — *i.e.*, between the time of the meeting at the middle school and the time of Johnson's arrest. During this time, Chief Ely repeatedly communicated with Johnson via text messages, using the cell phone that Johnson had given M.H. In these text message conversations, Chief Ely pretended to be M.H.

This exchange of text messages between Chief Ely and Johnson came to an end shortly after Johnson sent a text message in which he encouraged M.H. to come to his house. Although Chief Ely did not "break character" and reveal his true identity in response to Johnson's text, the chief did send an officer to find Johnson and tell him that M.H.'s mother wanted him to stop texting M.H.

A few minutes after the officer communicated this message, Johnson initiated a new series of text messages to M.H.'s phone. Based on the content of these text messages, it appears that Johnson first suspected that M.H.'s mother had taken possession of the phone. Then Johnson suspected (correctly) that the police had the phone. But by later that evening, Johnson was sending text messages indicating he thought M.H. might still have the phone.

The next day, Johnson was arrested.

During the State's summation at Johnson's trial, the prosecutor argued that this series of text messages between Johnson and Chief Ely proved that Johnson was "clearly engaging in non-consensual contact" with M.H. The prosecutor's assertion is problematic for a number of reasons.

First, M.H. testified that he was not aware of any of these text messages. M.H. knew that Chief Ely had taken possession of his cell phone, and that the chief planned to use the cell phone to contact Johnson. But M.H. also testified that he was never informed whether text messages were ever exchanged between Johnson and Chief Ely, or what the content of those text messages might have been.

(M.H.'s mother tangentially corroborated her son's testimony when she declared that there was "no communication" between Johnson and M.H. from the time of the school meeting until several months later, when Johnson encountered M.H. at the Black Bear store.)

When our stalking statute speaks of "non-consensual contacts", it is not speaking of "contacts" that the victim never learns of. Rather, it is speaking of contacts that the victim is aware of, or becomes aware of, and that occur against the victim's wishes. Here, the text messages between Johnson and the police chief were sent and received without M.H.'s knowledge. In addition, the State presented no evidence that *M.H.* (or anyone acting at M.H.'s direction) ever told Johnson to stop texting him.

Thus, the prosecutor had no evidentiary basis for asserting that Johnson's text messages to the chief of police constituted a series of contacts *with M.H.*, nor did the prosecutor have an evidentiary basis for asserting that these text messages were "non-consensual" in the sense that they were against M.H.'s wishes.

This is true even for the last several text messages that Johnson sent after the police officer stopped him (at Chief Ely's direction) and told Johnson that M.H.'s mother wanted him to stop texting M.H.

Because of what the officer told Johnson during this traffic stop, it may have been obvious to Johnson that *M.H.'s mother* and *the police* wanted him to stop contacting M.H. But there was no evidence that the officer told Johnson that *M.H.* wanted the text messages to stop.

Moreover, to prove the *actus reus* of stalking — *i.e.*, to prove that Johnson engaged in repeated non-consensual contact with M.H. — the State had to prove that Johnson's text messages to M.H. were *actually* against M.H.'s wishes. As we have already explained, M.H. never told Johnson to stop contacting him, and M.H. was not even aware of Johnson's text messages.

For these reasons, we reject the argument that Johnson's text messages to the chief of police constituted a series of non-consensual contacts with M.H.

The third part of Johnson's conduct in this case is the incident at the Black Bear store. Johnson had just been released from custody after being sentenced in his earlier stalking case involving M.H. Under Johnson's conditions of probation, he was prohibited from contacting M.H. In addition, Johnson had been served with a protective order that likewise prohibited him from contacting M.H. or any member of M.H.'s immediate family.

As we explained earlier, Johnson encountered M.H. in the store parking lot; Johnson was sitting in his truck when M.H. walked out of the store. Johnson yelled to M.H. that he had ruined his life, and he called M.H. a "prick". Johnson drove his vehicle in M.H.'s direction, but then he turned the vehicle and drove away.

At trial, M.H. testified that this encounter made him "nervous and scared". And in this context, the jury could reasonably conclude that M.H. was scared that Johnson might injure him.

But of the three parts of Johnson's conduct in this case, only this last part — Johnson's encounter with M.H. at the Black Bear store — could be characterized as non-consensual contact with M.H.

One act of non-consensual contact is not enough to establish the offense of stalking: the stalking statute requires proof of "repeated" acts of non-consensual contact.

We therefore conclude that the State's evidence in this case was not legally sufficient to establish the *actus reus* of stalking.

We further note that even if we accepted the State's assertion that Johnson's text messages to the chief of police (pretending to be M.H.) constituted "non-consensual contacts", the State's evidence failed to establish a link between those text messages and M.H.'s fear that Johnson might cause him injury or death.

The stalking statute requires proof that the victim's fear of injury or death *resulted from* the defendant's repeated non-consensual contacts. Even assuming that the series of text messages between Johnson and Chief Ely qualified as "non-consensual contacts", M.H. explicitly testified that he was unaware that this exchange of text messages was taking place, or what the content of any of those text messages might have been.

Thus, even viewing the evidence in the light most favorable to the jury's verdict, the State proved only that M.H.'s fear of injury or death was the result of the series of *consensual* contacts that occurred during the first weeks of Johnson's acquaintance with M.H. — contacts that M.H. later re-evaluated after his mother told him that Johnson had been convicted of child molestation — plus the single act of non-consensual contact between Johnson and M.H. at the Black Bear store.

For these reasons, we conclude that the evidence presented at Johnson's trial was legally insufficient to establish the crime of stalking, and we therefore reverse Johnson's stalking conviction.

*Conclusion*

We AFFIRM Johnson's convictions for first-degree unlawful contact and violation of a protective order, but we REVERSE his conviction for first-degree stalking. Accordingly, we remand Johnson's case to the superior court for re-sentencing.